Filed 6/26/14  Certified for publication 7/23/14 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056132 |
| v. | (Super.Ct.No. RIF150506) |
| JAMES ALBERT SWEENEY II et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Jeffrey J. Prevost, Judge. Affirmed with directions.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant, Ryan.

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant, Sweeney.

1

# I

## INTRODUCTION

A jury convicted defendants James Albert Sweeney II and Patrick Michael Ryan of 65 counts of white-collar crime and found true three special allegations. The court sentenced Sweeney to 33 years and Ryan to 31 years. The court also imposed restitution in the amount of $8,266,026 under Penal Code section 1202.4, subdivision (f).[1]

The final version of the second amended information alleged 65 criminal counts.[2] As to each of the 20 individual victims, it alleged three separate counts: the sale of unqualified securities (Corp. Code, § 25110); fraud in the offer of a security (Corp. Code, §§ 25401, 25540, subd. (b)); and grand theft (§ 487). As to all the victims, it alleged count 67, a fraudulent securities scheme (Corp. Code, §§ 25540, subd. (a), and 25541) and four counts—68, 69, 70, and 71—involving an endless chain scheme. (§ 327; Corp. Code, §§ 25110, 25401, 25540, subds. (a) and (b), and 25441. The information further alleged two special allegations for excessive takings (§§ 1203.045, 12022.6, subd. (a)(3)) and one for aggravated white-collar crime. (§ 186.11, subd. (a)(2)).

On appeal, both defendants challenge the sufficiency of the evidence on count 68 and the convictions on counts 67, 68, 69, 70, and 71, primarily involving multi-level

---

[1] Further statutory references are to the Penal Code unless stated otherwise.

[2] The trial court dismissed six counts—10, 11, 12, 40, 41, and 42—of the original 71 counts on the People's motion.

marketing programs.  Ryan also claims various sentencing errors, including those related to fines and restitution.[3]  Sweeney makes similar arguments.

We have reviewed the record and find sufficient evidence for count 68.  We also uphold the convictions on counts 67 through 71.  Defendants were engaged in an endless chain scheme and the unlawful sale of securities.  We affirm the judgment against defendants, subject to slight modification of their sentences as noted in our disposition.

II

STATEMENT OF THE FACTS

*A. The Marketing of Big Co-op and EZ2Win*

Sweeney and Ryan operated two related online shopping businesses—Big Co-op, a Delaware corporation, and its subsidiary, EZ2Win.biz—from an office located on University Avenue in Riverside.  Sweeney was the president of Big Co-op and Ryan represented he was president of EZ2Win although it was not a corporation.  Ryan was not an officer of Big Co-op.  Michael Huskisson, Rick DeLuca, and Andy Boado were salesman working for the two businesses.

Defendants were charged with operating an "endless chain" scheme in which investors paid for the opportunity to receive compensation based on recruiting new participants.  In related charges, they were charged with violating securities registration requirements based on fraudulent misrepresentations and material omissions.  Defendants

_____

[3] Defendants withdraw the argument about sentencing on count 67.

3

contend that the businesses were legitimate multi-level marketing enterprises. Defendants further argue that memberships in EZ2Win were not securities, that stock in Big Co-op was exempt from registration, and that the stock was sold with all required disclosures and without any fraudulent misrepresentations.

Defendants or their representatives sold interests in Big Co-op and EZ2Win through sales presentations used to recruit new people. At a typical meeting, defendants claimed the businesses were debt free and had been generating profits for several years. A 10-minute video featuring Sweeney talking about his business philosophy was shown at many meetings. Also used was a PowerPoint presentation describing EZ2Win.

Big Co-op was described as a multi-level marketing program. The businesses listed on the Big Co-op website included companies like Target, Ebay, Apple, Eddie Bauer, and Nordstrom. The speakers compared Big Co-op to Google and discussed an upcoming public offering using the same underwriter as Google. The speakers claimed investors could double, triple, or even quintuple their investments.

Defendants sold EZ2Win memberships at various levels. Attendees were told there were nine ways to make money. People could sign up as independent representatives or recruiters. The memberships provided rebates for online shopping via portals on the Big Co-op website. Other membership levels offered increased participation by setting up an individual website for the member. The memberships required an initial fee of a few hundred dollars and monthly payments. Members were

4

promised discounts and rebates for shopping and travel arrangements and could operate an individual online business.

The "founders" category of membership offered special benefits. Founders received a percentage of all membership sales and admission to annual conferences and retreats. Founders could sell merchant memberships, a license that would enable a local merchant to offer products on the Big Co-op website. The founders memberships cost $2,500 and a monthly payment of $99.

Members also received commissions based on recruiting additional people to join. The more members the victim recruited, the more money he or she would make as compensation. Victims were encouraged to purchase multiple memberships, assigning them either to family members or even fictitious people.

There was no discussion at the meetings about risk. It was not disclosed that Big Co-op was not registered, that the company had sustained consecutive losses over the five years with liabilities exceeding assets by $2.8 million or $3.4 million, and that there was no actual plan to take Big Co-op public.

B. *The Desist and Refrain Orders*

The Department of Corporations issued a Desist and Refrain Order (DRO) against Big Co-op in October 2006 and EZ2Win in May 2007. About 1,000 people had invested beginning in 2005 and about 250 responded to a questionnaire. Many of the investors were Filipino immigrants who lived in Northern California. Twenty-two of the investors had purchased Big Co-op stock certificates owned by Sweeney. The first DRO

ordered compliance with sections of the Corporations Code dealing with the offer of unqualified securities and the offer of securities by means of misstatement or omission of material fact about the stock offering. The second DRO was directed at the multi-level marketing program memberships.

The Department of Justice seized business records, banking records, computers, and other financial and marketing materials from the homes of defendants and others who were involved. Additional records were obtained from two banks. Among the documents seized were thousands of stock certificates for Big Co-op stock.

*C. Forensic Accounting*

Carl Richard, an investigative auditor with the Department of Justice, reviewed financial records for the period from June 2005 through December 2006. Revenues for the 18-month period for EZ2Win were about $1.207 million, derived from membership fees and monthly payments, and represented 14 percent of monies coming into the account. Income from the rebates and rewards program and travel commissions was about $91,000. In comparison, income from stock sales and the founders program was about $7.059 million and 85 percent of the money coming into the company. The company lost an average of $100,000 per month during the 18-month period.

The amount paid to Ryan from January 2005 to December 2006 was about $775,000. The amount paid to Sweeney was about $773,000. Additional expenses paid for the benefit of defendants from the proceeds of stock sales was about $2.039 million.

The money went toward cars, Tennessee property, cash, an engagement ring for Ryan, and other expenses related to Ryan's wedding.

The total amount of theft and security fraud charged in this case consisted of $7 million in stock sales plus $1.2 million in EZ2Win income, the amount received from the named victims. No significant funds were returned to the victims.

## D. Ryan's statement

Ryan gave a voluntary statement to a DOJ investigator. Ryan initially said that the EZ2Win sales and membership fees brought in hundreds of thousands of dollars per month, and the company was profitable. After he was shown the financial statements that indicated otherwise, Ryan said that he felt that it would be profitable in the future. He denied having told people that the company was profitable. He denied selling any stock except for some of Sweeney's stock to a few people. He also denied a plan for a public offering.

## E. Defense evidence

Pravin Mishra, the CEO and founder of Pugmarks, an internet services company, testified concerning his firm's work setting up and maintaining a website for Big Co-op. By 2002, Big Co-op had 50,000 members and Pugmarks fixed the website for the cost of $315,646. Pugmarks maintained the site until it was shut down in 2007.

The Big Co-op website allowed people to shop at e-commerce shops and receive a rebate. Another part was the multi-level marketing where members could recruit members and receive residual rewards when the recruited members shopped on the

7

recruiter's personal website.  Mishra described it as a unique concept that combined cooperative and multi-level marketing.

Compu-Sult, a custom computer software company, that mainly served network marketing and direct sales companies, was hired to build a compensation software package for Big Co-op's multi-level marketing system.  In September 2005, it built a different kind of system for EZ2Win.

III

SUFFICIENCY OF EVIDENCE—COUNT 68

Defendants both argue that insufficient evidence showed that EZ2Win was an endless chain scheme under section 327.  We conclude that, because the victims paid money for EZ2Win memberships and recruited other people to buy EZ2Win memberships, the EZ2Win scheme fit the classic paradigm of an endless chain.

In reviewing a challenge to the sufficiency of the evidence, we examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  (*Guerra,* at p. 1129.)  The conviction must be affirmed unless appellant clearly shows that there is no substantial evidence

8

whatsoever to support the verdict. (See *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1329.)

It is a violation of section 327 to "contrive[], prepare[], set[] up, propose[], or operate[] any endless chain." An "endless chain" is "any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant."

EZ2Win indisputably was an endless chain. To become members of EZ2Win, victims paid an initial fee and then signed up for indefinite monthly automatic deductions to maintain their memberships. Defendants told victims they earned commissions by recruiting other people to buy memberships in EZ2Win. The members, in turn, were instructed to recruit more members in EZ2Win. Commissions were based on a current member's sales of memberships to new members whether any of these members actually used their EZ2Win memberships to sell on their personal web portals. Ample evidence established this scheme fits squarely within the definition of section 327's endless chain.

Defendants argue that EZ2Win was not an "endless chain" because—instead of focusing on recruiting—the victims could have sold products through their personal Big Co-op website. The ability to sell products does not convert an endless chain scheme into a legitimate business. Defendants' arguments were rejected in *Bounds v. Figurettes, Inc.* (1982) 135 Cal.App.3d 1, 17-20, discussing *People v. Bestline Products, Inc.* (1976) 61

9

Cal.App.3d 879, and holding a marketing plan under which prospective distributors are led to believe that they will make large amounts of money by recruiting additional distributors is illegal.

Figurettes was a company involving the sales of lingerie by "Counselors." Bestline's business consisted of marketing household cleaning products. Bestline distributors recruited participants who in turn recruited new participants. The trial and appellate courts found the Bestline marketing plan constituted an illegal chain scheme prohibited by Business and Professions Code section 17500 and the scheme was inherently fraudulent: "The Bestline plan was similar to Figurettes in that Bestline's marketing program offered 'prospective distributors the expectation of a large annual income as a result of their recruiting additional distributors who would in like fashion bring in further recruits.' [Citation.] In *Bestline* as in the Figurettes plan 'opportunity meetings' were frequently held. The 'golden opportunities' flowing from participation in Bestline programs were described. Bestline like Figurettes was a multilevel sales scheme. Each had three levels of distributorship. Bestline's emotional appeal to 'growth to greatness' was not unlike the philosophy expounded at Figurettes meetings.

"The *Bestline* court concluded (after review of out-of-state decisions): 'The vice of the chain system aspect of the Bestline marketing system upon which the first cause of action was in part based was the inherent deceptiveness . . . . Since the promised rewards can only result to any level of participants in the pyramid in the event it grows to another

level, *it is obvious that ultimately the point will be reached where the necessary further recruitment is impossible*.' [Citation.]

"The *Bestline* court pointed out that the plan '*offered compensation for recruitment based upon sales to the recruits*. This element of the Bestline plan, which is what makes it a chain scheme under California law, serves to increase the certainty of deception by diverting the efforts of all distributors from retail sales to the sales of distributorships.' [Citation.] The court held that the Bestline program was thereby rendered per se deceptive under the policies embodied in the law of this state. [Citation.] [¶] . . . [¶]

"Figurettes also attempts to distinguish *Bestline* by pointing to the importance of retail sales to Figurettes. Extensive evidence and testimony was offered by Figurettes as to retail sales volume and the training offered to counselors for retail sales techniques including product fitting and care. However, retail sales do not legalize the pyramid marketing scheme which violates Penal Code section 327. The plan becomes illegal because it is part of the overall marketing plan which depends upon an endless chain of middlemen. As the *Bestline* court carefully pointed out [citation]: 'A pyramid sales plan under which the compensation for recruitment is limited to "payment based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme," does not come within the definition of endless chain schemes set forth in Penal Code section 327. *The section, however, declares the policy of this state that such schemes are deceptive when compensation is offered* "*for introducing*

11

*one or more additional persons into participation in the scheme*" *based upon sale to the person introduced.* It is on the basis of this policy that participation in such schemes is made criminal.'

"As the *Amway* decision (*infra*) states: '[T]he fact that some retail sales occur does not mitigate the unlawful nature of the method of recruiting. [Citation].' (*In the Matter of Amway Corporation* (June 23, 1978) Federal Trade Commission Docket No. 9023, Initial Decision, p. 107.)" (*Bounds v. Figurettes, Inc., supra,* 135 Cal.App.3d at pp. 18-19.)

As in *Figurettes* and *Bestline*, whether the victims here could have sold—or even did sell—products on the Big Co-op personal websites is immaterial. (*Bounds v. Figurettes, Inc., supra*, 135 Cal.App.3d at p. 19.) The question is whether the focus of EZ2Win—rather than the product sales themselves—was the recruitment of more members to buy into the scheme. Numerous victims testified that the overwhelming emphasis was on recruiting, not on product sales. The companies' leaders and presenters did not spend their time selling products; instead, they expended their energy solely on recruiting.

Defendants' presentations focused nearly exclusively on how members earned money by recruiting with no emphasis at all on product sales. Slide 10 in defendants' PowerPoint presentation trumpeted, "You Get Paid 5 Times Per Month" and "9 Ways You Can Make Big Money." Slide 11 pictured "You" recruiting Team A and Team B and promised $40 for each personal recruit. Slide 12 illustrated a "binary pay plan" with

12

payments increasing to a maximum of $25,000 per week, according to the number of recruits. In addition, slide 13 showed matching bonuses of 40 percent for all recruits. Slide 14 illustrated eight levels of recruits for the "Uni-level Pay Plan," earning about $76,000 monthly. Slide 23 focused wholly on the building of teams of recruits.

Only one quarter of one percent of the companies' funding came from actual sale of products. Defendants' scheme "depend[ed] upon an endless chain of middlemen." (*Bounds v. Figurettes, Inc., supra*, 135 Cal.App.3d at p. 19.) As characterized by defendants themselves, their program was designed to give members the major incentive to recruit new people to buy memberships in EZ2Win.

Finally, the EZ2Win scheme is not like the program *In re Amway* (1979) 93 F.T.C. 618, which the Federal Trade Commission found was not a pyramid scheme because its policies prevented inventory loading and encouraged retail sales. (*Id.* at pp. 715-716.) In contrast, EZ2Win encouraged members to buy multiple memberships themselves and put them under fictitious names. Also, in *Amway*, retail sales were required in order for participants to earn money. (*Id.* at p. 716.) With EZ2Win, retail sales were never required to earn money and almost no one actually tried to sell anything. Amway was not a pyramid scheme because its policies encouraged retail sales. No policy in EZ2Win enforced or encouraged retail sales.

IV

EZ2WIN WAS A SECURITY

Defendants contend the EZ2Win memberships were not securities because

13

members were not investors in a common venture and were not reliant on the managerial efforts of others for profit. Corporations Code section 25019 defines a "security" expansively, and includes "participation in any profit-sharing agreement" or an "investment contract," whether or not a written document evidences the investment. An "investment contract" is """"a contract or a transaction in which a person entrusts money or other capital to another, with the expectation of deriving a profit, income or some financial benefit from a business enterprise, the failure or success of which is dependent upon the managerial efforts of other persons."""" (*People v. Frederick* (2006) 142 Cal.App.4th 400, 413; *People v. Smith* (1989) 215 Cal.App.3d 230, 235.) It is a question for the trier of fact whether a particular investment is a security. (*Frederick,* at p. 413; *Smith,* at p. 236.)

Because the jury found that EZ2Win was an endless chain scheme under section 327, there was also substantial evidence that EZ2Win memberships were securities. California's "endless chain" scheme is "equivalent, if not identical" to federal law's "pyramid" scheme. (*Webster v. Omnitrition Int'l* (9th. Cir. 1996) 79 F.3d 776, 787.) Under federal case law, investments in a pyramid scheme are "investment contracts" and thus securities. (*Webster,* at p. 784.) It is well established that "federal cases construing federal securities laws are persuasive authority when interpreting our state securities law." (*Viterbi v. Wasserman* (2011) 191 Cal.App.4th 927, 939.) California courts have also found evidence of memberships in endless chain schemes is sufficient to support

14

convictions under California's securities law. (*People v. Frederick, supra,* 142 Cal.App.4th at pp. 413-414.)

Ultimately the determination about securities was a factual question for the jury to decide. (*People v. Frederick, supra*, 142 Cal.App.4th at p. 413; *People v. Smith, supra,* 215 Cal.App.3d at p. 236.) The jury heard the testimony of Kirk Wallace, an enforcement attorney with the Department of Corporations, that an endless chain or pyramid scheme can be a security. Additionally, EZ2Win members testified that they believed they were investors in EZ2Win. In particular, EZ2Win members were told the "founders program" gave them an ownership interest in EZ2Win. Victims also joined EZ2Win because they believed it was an alternative investment in Big Co-op, the parent company which was about to go public. Defendants treated investments in Big Co-op stock and EZ2Win memberships as interchangeable—accepting checks for stock purchases written to "EZ2Win."

Furthermore, the success of EZ2Win depended on Big Co-op and defendants' management of both enterprises, not on the members' efforts. (*People v. Frederick, supra*, 142 Cal.App.4th at p. 414.) As already discussed, it was not significant that members could earn money through their own efforts selling memberships or products. (*Id.* at pp. 413-414; *SEC v. Glenn W. Turner Enterprises, Inc.* (9th Cir. 1973) 474 F.2d 476, 482.) The EZ2Win member's most important role was to solicit new recruits. We hold substantial evidence supports the jury's finding that EZ2Win memberships were securities because EZ2Win was an endless chain scheme.

15

V

SECTION 654

On each of the 20 sets of three companion counts (counts 1 through 60), the trial court imposed sentence on the principal count and sentences on two additional counts to be served concurrently or consecutively but stayed under section 654. Defendants claim that the trial court erred by its oral pronouncement, and the corresponding minute order was improper because it imposed concurrent or consecutive sentences on counts involving the same acts and then stayed those sentences pursuant to section 654. Defendants' example of how the sentences should have been pronounced seems to be a distinction without any real difference.

The procedure followed here is exactly what is contemplated in *People v. Duff* (2010) 50 Cal.4th 787, 796: "[W]hen a court determines that a conviction falls within the meaning of section 654, it is necessary to *impose* sentence but to stay the *execution* of the duplicative sentence." *Duff* only prohibits the imposition of concurrent sentences in place of stays, as "the imposition of concurrent sentences is precluded by section 654 . . . because [under such a sentence] the defendant is deemed to be *subjected* to the term of *both* sentences although they are served simultaneously." (*Duff,* at p. 796.) Accordingly, the trial court's oral pronouncement staying the sentences on the counts involving the same acts fully complied with section 654 and the minute order should not be modified.

## VI

## FINES, FEES, AND RESTITUTION

The trial court imposed a $10,000 restitution fine under section 1202.4, subdivision (b)(1), and then stayed the fine based on its finding that defendants had the inability to pay. Respondent concedes it may have been improper to impose and then stay a fine because inability to pay is not a ground for staying a restitution fine, but rather only a factor a court can consider in setting the restitution fine in the first place.

We agree the proper remedy is to remand the issue to the trial court, not to modify the restitution fine on appeal. Inability to pay is one of the factors in setting the amount of the restitution fine. (§ 1202.4, subd. (d).) Other factors include: "the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime." While defendants' inability to pay might weigh against imposition of the statutory maximum, other factors strongly weigh in favor of doing so. Remand to the trial court to consider all the factors is the proper remedy.

Respondent also concedes that only one $10 fee may be imposed on each defendant. (*People v. Crittle* (2007) 154 Cal.App.4th 368, 371.) On remand, the trial court is directed to modify defendants' respective section 1202.5 fines from $200 to $10.

Defendants also challenge the direct victim restitution award in the amount of $8,266,026, arguing that its imposition without jury findings violated the Sixth

17

Amendment in light of the United States Supreme Court's decision in *Southern Union Company v. United States* (2012) ___U.S.___ [132 S.Ct. 2344, 183 L.Ed.2d 318].)  Our sister court in the Fourth District rejected this same contention in *People v. Pangan* (2013) 213 Cal.App.4th 574, 584-585.)  Section 1202.4 imposes victim restitution, not a "criminal fine," and therefore is not subject to the *Apprendi*[4] rule.

Respondent does not oppose correcting the minute orders and abstracts of judgment to reflect the trial court's oral pronouncement that defendants be held jointly and severally liable for the direct victim restitution it ordered in the amount of $8,266,026.  The typographical errors in the abstract of judgment should also be corrected, replacing "fraud in the office" to "fraud in the offer" and changing the direct victim restitution amount from "$48,266,026.00" to "$8,266,026.00."  Ryan's abstract of judgment also should be corrected as to the direct victim restitution amount.

VII

DISPOSITION

We affirm the judgment.  In the interests of judicial economy, we remand to the trial court for further proceedings to reconsider the amount of the restitution fee based on

_____

[4] *Apprendi v. New Jersey* (2000) 530 U.S. 466.

18

the relevant statutory factors and to make various corrections of the fines, fees, and typographical errors as discussed above.


CODRINGTON _____

J.

We concur:

KING _____
            Acting P. J.

MILLER _____
            J.

Filed 7/23/14

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E056132 |
| v. | |
| JAMES ALBERT SWEENEY II et al., | (Super.Ct.No. RIF150506) |
|     Defendants and Appellants. | |
| | ORDER |

IT IS ORDERED that the July 16, 2014, request for publication of the opinion filed June 26, 2014, is GRANTED. The opinion meets the standard for publication as specified in California Rules of Court, rule 8.1105(c).

CODRINGTON          

                J.

KING                

           Acting P. J.

1