Filed 2/16/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H043360 |
| Plaintiff and Appellant, | (Santa Cruz County Super. Ct. No. F23816) |
| v. | |
| CHARLES BAXTER BLACK, | |
| Defendant and Respondent. | |

Defendant Charles Baxter Black was charged with five counts of using false statements in the offer or sale of a security (Corp. Code, §§ 25401, 25540, subd. (b)) after he persuaded an acquaintance, Bronic Knarr, to invest in a real estate development opportunity in Idaho in return for a promissory note, the terms of which were amended and extended several times but never realized. The trial court set aside two of the counts pursuant to Penal Code section 995 based on a determination that the promissory note was not a security. The People appeal the order granting the motion to dismiss those two counts. We find that the promissory notes offered for Knarr's investment in the real estate development scheme were not securities within the meaning of the Corporate Securities Law. Accordingly, Black cannot be held to answer those charges.

## I. BACKGROUND

### A. Terms of the Promissory Notes

The promissory note dated May 17, 2006, was written on "Atherton LLC, a land development company" letterhead and listed Atherton, LLC as "borrower" and Knarr as "lender." The note stated that Atherton, LLC promised to pay $124,456 to Knarr "together with interest thereon which shall be calculated in the following manner:

"(a) In the event the real property located at 177 and 200 North Edgewood Lane, Eagle, Idaho is sold by Borrower, the amount of interest shall be based on the percentage of profits minus expenses Borrower receives from the sale; or

"(b) In the event Borrower develops said real property, Lender shall receive two (2) lots based on the tentative map to be selected by Lender.

"(c) In the event that neither (a) or (b) take place before one year from the making of this note, the principal together with interest at the rate of ten percent (10%) shall become due and payable at the election of Lender."

The note further stated that "Charles Black who is executing this Note has agreed that his separate property shall be bound hereby and that resort may be had to such separate property for the payment and enforcement of this Note." The note was signed only by Black as "managing member" of Atherton, LLC.

On May 8, 2007, Black and Knarr signed an amendment to the note to reflect that Knarr had increased his investment by $155,474 to $279,920,[1] and that Knarr would receive one residential acre, not two lots, under term (b) if the property was developed. The May 2007 amendment also extended the maturity date to August 2008. The parties thereafter extended the maturity date of the note three times, on July 21, 2008, August 15, 2009, and on March 17, 2010, for a final extension until January 17, 2012. Knarr did not provide additional money in connection with the second, third, or fourth amendments to the note. All other terms remained unchanged.

---

[1] We calculate that $124,456 as reflected in the original promissory note, plus $155,474 as reflected in the amendment to the promissory note, totals $279,930 rather than $279,920. We nevertheless recite the numbers as they appear in the record.

2

## B. Factual Background[2]

Knarr was a corporate vice president who became acquainted with Black when Black worked as a headhunter. The men had known each other for about six years when, in early 2006, Black called Knarr to introduce him to a real estate opportunity. Black said that he had friends who had done well investing in property in Idaho and asked Knarr to invest in a spot that he had identified for downtown development. Black would manage the investment and hoped for a ten-fold return in a year or less.

Knarr gave Black $124,456 which "was to take care of two residential pieces out of the" development at a rate of $6 a square foot. Black documented the amount in the May 2006 promissory note. Knarr testified that he would not have invested without the third term that promised a 10 percent return if sale or development of the property failed, saying: "I was told that I was the guy who was protected. And that I didn't have anything to worry about because of the way the note was written. All I ever had to do was ask for my money out." The parties modified the note in May 2007 to reflect Knarr's additional investment of $155,474 and extended the maturity date of the note several times, through mid-January 2012. Knarr testified that bureaucratic and other delays "ended up stretching it out." Knarr did not provide additional money in connection with the second, third, or fourth amendments to the note and declined Black's invitation to invest more money. He agreed on cross-examination that the promissory note reflected the possibility that the deal would not go through and Black would be unsuccessful in his effort to purchase or develop the property.

Knarr had "weekly" conversations with Black about the property that continued "way past 2008," and Black provided regular updates about the progress of the investment up until the end of April 2012. By that time, Knarr had made inquiries that

[2] The factual summary is derived from testimony and evidence presented at Black's preliminary hearing held on January 27, 2014.

3

revealed information inconsistent with what Black had told him about the status of certain height ordinances relevant to the property. Knarr was suffering health problems and "didn't have the confidence" to continue waiting. He asked Black for his money but received no response and ultimately hired a private investigator.

Detective Brian Cleveland of the Santa Cruz Sheriff's Office testified that Atherton, LLC was not a California registered company and that Black also operated under another company name that was not registered in California. Detective Cleveland confirmed that Black had been involved in a deal with the owners, named Karen and Pat Towne, of the property in Eagle, Idaho that was identified in the promissory note. Sometime in 2005, Black had arranged to purchase the property for $8.8 million and had paid the Townes between $250,000 and $300,000 in earnest money to keep them from selling the property in 2006 and 2007. Black also had hired a company to visit the property in 2006 and to assess the city codes and entitlements in connection with developing the land. However, the Townes had not heard from Black since 2008.

Black told Detective Cleveland that his job was to get the property under contract so that it could be developed. Black explained that Knarr had loaned him about $270,000, which money he was due to repay, and that he had told Knarr that he had backed off the property while watching the city council on issues like height ordinances, but that he still wanted to make the deal happen.

Detective Cleveland determined from certain bank records for the relevant time frame that the balance in Black's accounts did not contain sufficient funds to repay the amount of money provided by Knarr. Before each of the deposits traced to Knarr, Black's account balance was $84.54, $61.91, and $8.66. Outgoing payments from Black's account during the relevant period included checks written to cash, checks to himself, bill payments, rent payments, and a few checks to a business partner, James Riboir (also referred to in the record as James McGuire).

4

McGuire was a real estate agent who knew Black from prior dealings. McGuire partnered with Black and they agreed that McGuire would provide the earnest money to the Townes and Black would cover entitlement fees and land surveys, which totaled about $200,000. McGuire told Detective Cleveland that he and Black did not intend to raise the amount needed to purchase the land themselves but were going to find an investor. McGuire invested about $160,000 in the property, though he knew it was a risky deal with potential for losing money.

A third individual, David Faye, also invested in the Eagle, Idaho property. Faye had given Black $20,000 toward the deal in early 2006 but later was unsuccessful in attempts to follow up with Black about his investment.

### C. Procedural History

#### 1. Initial Charges

In August 2013, the Santa Cruz County District Attorney filed a complaint charging Black with three counts of theft by false pretenses (Pen. Code, § 532, subd. (a); counts 1-3) and three counts of making false statements in the offer or sale of a security (Corp. Code, §§ 25401, 25540, subd. (b); counts 4-6). The complaint also alleged enhancements pertaining to the aggregate value of property taken (Pen. Code, §§ 12022.6, subds. (a)(2), (b)) and the pattern of fraud and embezzlement in the offenses charged (*id*. § 186.11, subd. (a)(1)), as well as probation ineligibility under Penal Code section 1203.045, subdivision (a).

#### 2. First Amended Information

After the preliminary hearing and briefing and argument by the parties, the magistrate found insufficient evidence of a false pretense, stating that the evidence "is not persuading me, even by the low standard of a preliminary examination, that there's satisfactory evidence of an intention to deceive at the time Mr. Knarr parted with his money."

5

The magistrate held Black to answer only the charges of using false statements in the offer or sale of a security. The magistrate agreed with the prosecution "that the parties were construing this instrument as an investment contract." The magistrate explained, "I do find there is sufficient evidence that Mr. Black, at the time he made the statements to Mr. Knarr, knew that Mr. Knarr was the first or only investor, he was well aware of Mr. Black's own precarious financial condition, and while he might have had good intentions and the hope that this project was going to realize, in connection with the sale of a security, the Corporations Code appears to impose a duty to disclose the full facts about whether or not he had the ability to perform the final promise, which is if, at the end of the 12-month period, you're not comfortable where we are, I'll pay you back. . . . [¶] . . . [¶] . . . [W]hile I have my doubts about whether this is appropriately dealt with as a criminal case, I do think there's sufficient evidence to create a strong suspicion to believe that the crime of violating Corporations Code Section 25401 was committed . . . . "

These three counts became counts 1, 2, and 3 in a first amended information filed in March 2014. Each count pertained to a different time period—count 1 occurring between April and mid-June 2006 (when Black executed the May 2006 promissory note), count 2 occurring between December 2006 and March 2007, and count 3 occurring between April and May 2007. The first amended information alleged the same enhancements and probation ineligibility as the original complaint.

### 3. *Motion to Dismiss the First Amended Information*

In July 2014, Black filed a motion to dismiss the first amended information pursuant to Penal Code section 995. He argued that under paragraph (c) of the promissory note, his obligation to repay was not dependent on the outcome of the enterprise but was absolute, making the transaction a loan between associates, not a security. Black further argued that even if the promissory note was a security transaction,

6

he did not violate the disclosure requirements imposed by section 25401 of the Corporations Code. The trial court denied the motion in a minute order.

### 4. *Second Amended Information and Motion to Dismiss*

Over a year later, in November 2015, the district attorney filed a second amended information charging Black with two additional counts of using false statements in the sale of a security (Corp. Code, §§ 25401, 25540, subd. (b); counts 4-5) and modifying the time periods for counts 2 and 3. As amended, count 2 occurred between December 2006 and June 2007, when Black received the additional investment from Knarr and executed an amendment to the promissory note to reflect the increased amount due of $279,920. Count 3 occurred between July and August 2008, when the parties extended the promissory note. Counts 4 and 5 occurred between August and September 2009, and March and April 2010, respectively, when the parties extended the promissory note two more times.

In January 2016, Black filed another motion pursuant to Penal Code section 995, this time seeking to set aside counts 4 and 5 of the second amended information.[3] Black raised many of the same arguments as in his previous motion challenging counts 1 through 3, arguing that the transaction failed to qualify as a security under the "risk-capital test" often applied by California courts. He asserted that the transaction between two individuals did not involve a widely disseminated investment offer, and the provision for repayment of the principal plus 10 percent had essentially eliminated the risk. He also argued that even if the original promissory note and amendment covered by counts 1, 2, and 3 were securities, the extensions of the promissory note in counts 4 and 5 were not, because "no money or funds were exchanged."

---

[3] Concurrent with the Penal Code section 995 motion to dismiss counts 4 and 5, Black filed a motion requesting that the court exercise its discretion to dismiss all counts pursuant to Penal Code section 1385 and under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497. The trial court denied that motion on March 9, 2016.

The district attorney responded that the trial court had considered and rejected nearly identical arguments for counts 1, 2, and 3, and it would be improper to remove final determination of whether the instrument constituted a security from the province of the jury. The district attorney argued that Black's application of the "risk-capital test" was contrary to the flexible determination preferred under the securities laws. He pointed out that the risk-capital test was not binding because the instrument at issue satisfied a different test also applied by California courts—the federal or *Howey* test derived from *S.E.C. v. Howey Co.* (1946) 328 U.S. 293 (*Howey*). He asserted that there was sufficient evidence under that test to show that Knarr had entrusted money to Black with the expectation of receiving a profit from a business enterprise, which profit would wholly depend on the managerial efforts of Black. The district attorney further argued that an exchange of money was not necessary for counts 4 and 5 because a forbearance constitutes consideration.

The trial court concluded that the May 2016 promissory note and amendments thereto (hereafter promissory notes) were not securities under either the risk-capital or *Howey* tests. The court found that the evidence of other investors in the Idaho property (James McGuire and David Faye) was insufficient to meet the public offering prong of the risk-capital test. The court also found insufficient evidence that Knarr was "led to expect profits solely from the efforts of the promoter" noting that "the return, the principal plus 10% had no connection to any efforts, it was simply a note. A promissory note with a rate of interest on it."[4] The court granted Black's motion to dismiss counts 4 and 5 of the second amended information.

---

[4] The trial court summarized its reasoning with an analogy: "[I]f my niece came to me and said I'm thinking about opening my cupcake business. . . . I'm looking at some property . . . and I am negotiating with the landlord there. But I need money from you, Uncle Steve, and so I want you to invest. I want you to lend me $10,000 so that I can start my cupcake business. [¶] And I might say to her, well, what's in it for me? And she would say, well, I'll give you several options. First of all, if I open the business and (continued)

8

## 5. *Appeal and Petition for Writ of Mandate*

The People timely filed this appeal pursuant to Penal Code section 1238, subdivision (a)(1), challenging the order to set aside counts 4 and 5. The People also filed a petition for writ of mandate, case No. H043385, which this court summarily denied on June 2, 2016. We granted the People's request for judicial notice of the record in the writ proceeding (Evid. Code, § 452, subd. (d)).

## II.   DISCUSSION

### A. Standard of Review

Pursuant to Penal Code section 995, a court properly sets aside all or part of an information upon finding that the defendant "has been committed without reasonable or probable cause." (Pen. Code, § 995, subd. (a)(2)(B).) " ' " 'Reasonable or probable cause' means such a state of facts as would lead a [person] of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." ' " (*People v. Mower* (2002) 28 Cal.4th 457, 473.) The showing required at this stage "is exceedingly low" (*Salazar v. Superior Court* (2000) 83 Cal.App.4th 840, 846), and an information " 'should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged.' " (*Id.* at p. 842, quoting *People v. Superior Court* (*Jurado*) (1992) 4 Cal.App.4th 1217, 1226.)

In reviewing a Penal Code section 995 motion "the appellate court in effect disregards the ruling of the superior court and directly reviews the determination of the magistrate holding the defendant to answer." (*People v. Laiwa* (1983) 34 Cal.3d 711, 718; accord, *Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072 (*Lexin*).) Insofar as the motion "rests on consideration of the evidence adduced, we must draw all reasonable

---

then I sell the business at a profit, I'll give you 50% of the profits. Second of all, if I . . . open the business and keep it open, you get free cupcakes for life. Or third, whenever you want or in a year, you get your money back plus 10%. . . . [¶] . . . [¶] . . . It's not a security. It's a loan from me to my niece. And if my niece . . . never opens her cupcake business, she still owes me my money and 10%."

9

inferences in favor of the information [citations] and decide whether there is probable cause to hold the defendant[] to answer, i.e., whether the evidence is such that 'a reasonable person could harbor a strong suspicion of the defendant's guilt.' " (*Lexin*, *supra*, at p. 1072.) But "where the facts are undisputed, the determination of probable cause 'constitute[s] a legal conclusion which is subject to independent review on appeal.' " (*People v. Superior Court* (*Bell*) (2002) 99 Cal.App.4th 1334, 1339, quoting *People v. Watson* (1981) 30 Cal.3d 290, 300.)

### B. Unlawful Offer or Sale of a Security

#### 1. *Legal Framework*

The charges at issue arise under the Corporate Securities Law of 1968 (Corp. Code, §§ 25000-25707) (Corporate Securities Law), which was patterned after the federal Securities Act of 1933 (15 U.S.C. § 77b). (*People v. Schock* (1984) 152 Cal.App.3d 379, 387 (*Schock*).) The Corporate Securities Law "provides a comprehensive system of securities regulation" in California. (1 Marsh & Volk, Practice Under the Cal. Securities Laws (2011) § 1.01, p. 1–3 (Marsh & Volk.) Its main objective is the "creation of a balanced regulatory scheme to cope with the problems of modern securities markets . . . ." (*Ibid.*; *People v. Cole* (2007) 156 Cal.App.4th 452, 472.)

Corporations Code sections 25401 and 25540 "criminalize the sale or purchase of securities by means of oral or written communications which either contain false or misleading statements or omit material facts . . . ."[5] (*Simon*, *supra*, 9 Cal.4th at p. 496.)

---

[5] Corporations Code section 25401 states: "It is unlawful for any person to offer or sell a security in this state, . . . by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading."

Corporations Code section 25540, subdivision (b) imposes criminal penalties on a person convicted of willfully violating section 25401 of up to five years in prison, a fine of no more than $10 million, or both. Though not at issue in this case, a violation of (continued)

10

Whether the promissory notes may be deemed securities presents a mixed question of law and fact:  " 'The definition of a security is a matter of law.  It is the judge's duty to instruct the jury concerning that definition:  the way in which a security is identified.  Whether a particular piece of paper meets that definition, however, is for the jury to decide.' "  (*People v. Figueroa* (1986) 41 Cal.3d 714, 733-734 (*Figueroa*), quoting *United States v. Johnson* (5th Cir. 1983) 718 F.2d 1317, 1321, fn. 13.)

"[T]he corporate securities laws do not contain an 'all-inclusive formula by which to test the facts in every case.  And the courts have refrained from attempting to formulate such a test.  Whether a particular instrument is to be considered a security within the meaning of the statute is a question to be determined in each case.  In arriving at a determination the courts have been mindful that the general purpose of the law is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon.' "  (*Figueroa*, *supra*, 41 Cal.3d at p. 736, quoting *People v. Syde* (1951) 37 Cal.2d 765, 768.)

Corporations Code section 25019 defines "security" by listing transactions and instruments deemed to be securities, including "any note; stock; . . . bond; . . . evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; . . . investment contract; . . . or, in general, any interest or instrument commonly known as a 'security . . . .' "  This list is "expansive," but is not applied literally.  (*Figueroa*, *supra*, 41 Cal.3d at p. 734; *Reiswig v. Department of Corporations* (2006) 144 Cal.App.4th 327, 334 (*Reiswig*).)  Rather, "the 'critical question' . . . is whether a transaction falls within the regulatory purpose of the law regardless of whether it involves an instrument which comes within the literal language of the definition."  (*Figueroa*, *supra*, at p. 735.)

---

Corporations Code section 25401 also may be the basis for administrative or civil penalties.  (*People v. Simon* (1995) 9 Cal.4th 493, 509 (*Simon*).)

11

## 2. The *Howey* and Risk Capital Tests

California courts have relied on two distinct tests in evaluating an alleged security: the risk capital test and the federal or *Howey* test. The risk capital test, articulated by the California Supreme Court in *Silver Hills Country Club v. Sobieski* (1961) 55 Cal.2d 811, 815 (*Silver Hills*), describes " '[1] an attempt by an issuer to raise funds for a business venture or enterprise; [2] an indiscriminate offering to the public at large where the persons solicited are selected at random; [3] a passive position on the part of the investor; [4] and the conduct of the enterprise by the issuer with other people's money.' " This test reflects the court's assessment that the term "security" is defined broadly in order "to protect the public against spurious schemes, however ingeniously devised, to attract risk capital." (*Id.* at p. 814.)

The federal or *Howey* test, formulated by the United States Supreme Court in *Howey*, *supra*, 328 U.S. at page 301, asks "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." A common enterprise "may be established by showing 'that the fortunes of the investors are linked with those of the promoters,' " such as by a profit sharing arrangement. (*S.E.C. v. R.G. Reynolds Enterprises, Inc.* (9th Cir. 1991) 952 F.2d 1125, 1130.) An expectation of profits produced by the efforts of others exists "when ' "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." ' " (*Id.* at p. 1131.)

It is generally accepted that both the risk capital and federal tests may be applied, either separately or together; a transaction is a security if it satisfies either test. (*Consolidated Management Group, LLC v. Department of Corporations* (2008) 162

Cal.App.4th 598, 610; *Reiswig*, *supra*, 144 Cal.App.4th at p. 334; but see *People v.*
*Graham* (1985) 163 Cal.App.3d 1159, 1166-1167.)[6]

Thus, in *Schock*, the court reversed the denial of a prosecution motion to reinstate
the complaint, finding the defendants' public sale of fractional interests in secured
promissory notes did not satisfy the risk capital test but "fit squarely within the federal
test: specifically, that ordinary individual investors—many committing relatively modest
sums—relied upon the skill, services and solvency of [the enterprise] to protect their
investments." (*Schock*, *supra*, 152 Cal.App.3d at p. 388.) Likewise, in *People v. Smith*
(1989) 215 Cal.App.3d 230 (*Smith*) the court explained that while California courts often
use the risk capital test for defining a security, it is "a general test, and is not applicable in
all situations. Federal definitions of securities are also used in California when
appropriate in determining whether an investment vehicle is a security . . . ." (*Id.* at
p. 237.) And in *Figueroa*, our Supreme Court declined "to explore the precise
relationship between the federal and state tests" but acknowledged that "the federal cases
are significant because they underscore the necessity of looking through form to
substance." (*Figueroa*, *supra*, 41 Cal.3d at p. 737, fn. 28.)

We accordingly reject any implication in Black's argument that the relevance of
the federal test is muted by the risk capital test in California. We proceed under the
framework of both tests, either separately or together.

---

[6] The court in *People v. Graham* questioned the applicability of the *Howey* test
following the California Supreme Court's articulation of the risk capital test in *Silver*
*Hills*, but acknowledged that the *Howey* and risk capital tests share common elements—
particularly the requirement that the investor not exercise managerial control over the
enterprise. (*People v. Graham*, *supra*, 163 Cal.App.3d at pp. 1167-1168.) The court
rested its decision on that shared requirement and thus refrained from deciding "whether
the *Silver Hills* risk capital analysis is the exclusive definition of a security in California
or whether, as some courts and commentators have suggested, the *Howey* and *Silver Hills*
tests are complementary and alternative." (*Id.* at p. 1168, fn. 12.)

### 3. The Promissory Notes Do Not Constitute Securities Within the Meaning of the Corporate Securities Law

The People contend that the evidence at the preliminary hearing established reasonable cause to believe the promissory notes were securities given the nature of Knarr's investment, his expectation for profit, his lack of control over the success of the land deal, and Black's inadequate collateral to support his promise to repay the investment plus interest. Relying heavily on *Smith*, *supra*, 215 Cal.App.3d at page 237, the People urge this court to apply the *Howey* test in evaluating Black's transactions with Knarr, asserting that (1) Knarr entrusted his money to Black as an investment in the land deal; (2) Knarr expected to receive some profit—by the sale of the property, the development of the property, or the return of his investment plus 10 percent; and (3) the success of the deal was dependent on Black's efforts, about which Black communicated frequently and, according to Knarr, appeared to be "incredibly on top of it." The People also challenge Black's argument to the trial court that the promissory notes were not securities because there was no "downside risk" to Knarr based on term (c) of the contract, which entitled Knarr to the return of his money at a fixed rate of interest even if the proposed deal failed. The People do not argue that the promissory notes qualify as securities under the risk capital test.

Black responds that even if the federal test applies, the promissory notes were not securities but rather made up a unique agreement that was negotiated one-on-one between the parties and was not designed to be publicly traded. Black focuses on the United States Supreme Court's decision in *Marine Bank v. Weaver* (1982) 455 U.S. 551 (*Marine Bank*), which reversed a Court of Appeals' ruling that a unique agreement not designed for common trading might be an " 'investment contract' " or other type of security. (*Id.* at p. 559.) Black points out that even in *Smith*, and the other cases relied upon by the People, a common investment product was offered to numerous investors. Black also argues that Knarr's repayment was not contingent on the success of the enterprise

because he had the right to be repaid under term (c), and the evidence was insufficient to show that Knarr would not have been able to fulfill that obligation.

It cannot be denied that " 'an indiscriminate offering to the public at large where the persons solicited are selected at random . . .' " is a factor in the risk capital test (*Silver Hills*, *supra*, 55 Cal.2d at p. 815) that finds no supporting facts here. Having stated earlier that either the risk capital or the federal tests may be referenced in determining whether the promissory notes were securities, we turn to the *Howey* test. We remain mindful of our guiding dictate that a transaction must "fall[] within the regulatory purpose of the law . . . ." (*Figueroa*, *supra*, 41 Cal.3d at p. 735.)

The promissory notes in this case display certain essential characteristics of an "investment contract" under the *Howey* test, particularly given the undisputed evidence that Knarr agreed to put his money toward the proposed Idaho land deal and was led by Black to expect substantial profits as a result of Black's efforts. This evidence supports the magistrate's conclusion that "the parties were construing this instrument as an investment contract" as opposed to a simple promissory note or loan.

At the same time, we cannot ignore the unique nature of the agreement between two associates, the terms of which provided for repayment regardless of whether the Idaho deal succeeded. On cross examination, Knarr agreed that his "repayment was not contingent on Mr. Black buying property or developing property" because of term (c) of the promissory note. The magistrate at the end of the preliminary hearing observed, "Seems to me that the written language of the contract did away with the risk."

We examine the relevant authorities to aid our interpretation of these factors, beginning with *Smith* and *Marine Bank*. The defendant in *Smith* was convicted of two counts of securities fraud, as well as grand theft, related to the sale of 70 limited partnership units in an Idaho ranch. (*Smith*, *supra*, 215 Cal.App.3d at pp. 232-233.) The prospectus and partnership agreement provided to the investors contained misinformation about how and where the funds for the ranch would be kept. (*Id*. at p. 234.) The trial

15

court instructed the jury on the term "investment contract" using the elements of the federal test. (*Id*. at p. 235.) Smith argued on appeal that the court erred in rejecting his proffered jury instruction defining a "security" to include the element that the defendant "made an 'indiscriminate offering to members of the general public.' " (*Id*. at p. 236.) The proffered instruction would have benefited Smith because many of the investors were not "general public" but held other investments with Smith's company. (*Ibid*.)

The *Smith* court rejected this argument by explaining that unlike the statutory requirement that securities be qualified or registered with the state—for which there is an exemption for securities not offered or sold to the public (Corp. Code, § 25102, subd. (f)), "the prohibition against making false or misleading material statements in the offer or sale of securities does not contain exemptions (§ 25401), and so is applicable to the offer or sale of all securities, public or not." (*Smith*, *supra*, 215 Cal.App.3d at pp. 236-237.) The court acknowledged the public offering requirement in the risk capital test but reasoned that "[f]ederal definitions of securities are also used in California when appropriate in determining whether an investment vehicle is a security, [citations] and these do not include a 'public offering' requirement." (*Id*. at p. 237.) The court emphasized the case-specific approach to determining whether a particular instrument is to be considered a security within the meaning of the statute and concluded: "If misleading statements or omissions are prohibited only where the investments are indiscriminately offered to the public, many investors would be unprotected by the securities fraud laws. Under Smith's theory, an offeror of securities would be free to make false or otherwise misleading material statements or omissions to prospective investors with whom he or she had previously done business." (*Id*. at p. 238.)

The People seek to extend the reasoning in *Smith*, as it pertains to the prohibition against false or misleading statements in the sale or offer of a security, to the test for what *is* a security, arguing that "if the definition of a security requires a public offering, defendant was free to make false or misleading statements or omissions to Knarr, or other

16

individual victims, as long as he did not offer the deal indiscriminately to the public." This argument draws a false equivalence between two distinctly different concepts—one being that Corporations Code section 25401 contains no limit on its application to the offer or sale of securities, "public or not" (*Smith*, *supra*, 215 Cal.App.3d at p. 237), and the second being that the " 'basic test' " in federal cases to distinguish a security from other commercial dealings does "not include a 'public offering' requirement." (*Ibid*.) *Smith* offers an explanation only for the first concept. It does not support the logical leap the People propose, particularly in light of *Marine Bank*, which directly addresses the relevance of a public offering to the federal test for a security.[7]

*Marine Bank* was a civil action under the antifraud provisions of the federal Securities Exchange Act of 1934. (*Marine Bank*, *supra*, 455 U.S. at p. 554.) The case involved two instruments, a conventional certificate of deposit and a business agreement between two families. One family, the Weavers, bought a federally insured certificate of deposit and pledged it to Marine Bank as collateral for a loan to Columbus, a slaughterhouse and meat market owned by the Piccirillos. (*Id*. at pp. 552-553.) The Piccirillos and Weavers signed an agreement which stated that as long as the Weavers guaranteed the loan to Columbus, they would receive 50 percent of Columbus's net profits and $100 per month. They also would receive rights to use the barn and pasture at the Piccirillos' discretion and to veto future borrowing by Columbus. (*Id*. at p. 553.) The Weavers alleged that Marine Bank "solicited them to guarantee the $65,000 loan to Columbus while knowing, but not disclosing, Columbus' financial plight or the bank's plans to repay itself from the new loan guaranteed by the Weavers' pledged certificate of deposit." (*Id*. at p. 554.)

---

[7] *Smith* was decided seven years after *Marine Bank* but does not discuss the Supreme Court's decision in that case.

The Supreme Court emphasized that while the definition of " 'security' " is "quite broad," there are limits. (*Marine Bank*, *supra*, 455 U.S. at p. 555.) "Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud." (*Id*. at p. 556.) Courts therefore must evaluate the " ' "character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." ' " (*Ibid*.) Of particular relevance here, the Supreme Court determined that the agreement between the families was not a security, though the Court of Appeals had found the agreement to be within the definition of an " 'investment contract' " under *Howey*. (*Id*. at p. 559.)

The high court explained that "Congress intended the securities laws to cover those instruments ordinarily and commonly considered to be securities in the commercial world, but the agreement between the Weavers and the Piccirillos is not the type of instrument that comes to mind when the term 'security' is used and does not fall within 'the ordinary concept of a security.' " (*Marine Bank*, *supra*, 455 U.S. at p. 559.) The Supreme Court noted the unique aspects of the agreement, such as use of the barn and veto power over future loans, giving the Weavers "a measure of control . . . not characteristic of a security" (*id*. at p. 560), as well as that "the Piccirillos distributed no prospectus to the Weavers or to other potential investors, and the unique agreement they negotiated was not designed to be traded publicly." (*Ibid*.) The Supreme Court contrasted these facts with the "usual instruments found to constitute securities in prior cases" (*id*. at p. 559), which involved "offers to a number of potential investors" (*ibid*.) or instruments that "had equivalent values to most persons and could have been traded publicly." (*Id*. at p. 560.) The Supreme Court concluded that "[a]lthough the agreement gave the Weavers a share of the Piccirillos' profits, if any, that provision alone is not sufficient to make that agreement a security. Accordingly, we hold that this unique agreement, negotiated one-on-one by the parties, is not a security." (*Ibid*.)

18

The People seek to distinguish the transaction in this case from the idiosyncratic agreement between the families in *Marine Bank*. They contend that the terms of the promissory notes were general enough that the notes could have been widely offered or sold, and the one-on-one nature of the transaction should not remove it *as a matter of law* from the protection of the securities laws, particularly because the definition of a security does not require a public offering. (See *Smith*, *supra*, 215 Cal.App.3d at p. 237.) The People further argue that *Marine Bank* "was interpreting specific federal statutes" and does not address a security under California law.

It is well settled that "federal cases construing federal securities laws are persuasive authority when interpreting our state law." (*Viterbi v. Wasserman* (2011) 191 Cal.App.4th 927, 937; accord, *People v. Sweeney* (2014) 228 Cal.App.4th 142, 153.) The California Supreme Court has recognized that the federal definition of a security "served as the model for the definition in Corporations Code section 25019" and "decisions interpreting the federal definition are helpful in resolving issues presented under the state law." (*Figueroa*, *supra*, 41 Cal.3d at p. 727, fn. 14; see also *Schock*, *supra*, 152 Cal.App.3d at pp. 387-388 [consulting federal interpretation of the term "security" within the meaning of the federal Securities Act]; Marsh & Volk, *supra*, § 1.03[3][d][4], p. 1-12 ["The 'investment contract' language in the definition of security brought within the framework of the California statute all of the later decisions dealing with that term under the Securities Act of 1933."].) What is more, in this instance we are employing the federal test; it follows that the United States Supreme Court's interpretation of how that test is applied warrants due consideration.

The promissory notes in this case exhibit several features flagged by the Supreme Court in *Marine Bank* and differ significantly from the investment product in *Smith*. Knarr's investment in the Idaho deal represented an individually negotiated, one-on-one transaction with Black. Knarr testified, for example, that he would not have invested with Black if term (c) had not been included in the promissory notes. Knarr also testified

19

that he traveled with Black to Idaho to see the property and called the project "an obsession for both of us," stating that he and Black "talked all the time about it, way past 2008." There was no prospectus or indication that the arrangement with Knarr "could have been traded publicly" (*Marine Bank*, *supra*, 455 U.S. at p. 560) or even offered more widely.[8] By contrast, the defendant in *Smith* offered a uniform product of 70 limited partnership units in a ranch at $10,000 per unit (*Smith*, *supra*, 215 Cal.App.3d at p. 233) and generated a prospectus to provide information about himself and the product. (*Id*. at p. 234.) Even though the court in *Smith* highlighted the absence of a public offering requirement from the federal test, *Smith* itself involved a uniform instrument offered to numerous investors.

Furthermore, term (c) of the promissory notes, together with the provision binding Black's separate property for purposes of enforcing payment on the notes, inserted an element of redress that would be unlikely to "fall within 'the ordinary concept of a security.' " (*Marine Bank*, *supra*, 455 U.S. at p. 559, quoting *United Housing Foundation*, *Inc*. *v*. *Forman* (1975) 421 U.S. 837, 848; see also *People v*. *Davenport* (1939) 13 Cal.2d 681, 690 [contract in which the "alleged purchaser of the 'security' . . . *had a right to be paid whether the business prospered or not . . .*" was not a security].) The People rightly point out that the promise of a fixed return does not in itself remove the transaction from the protective sphere of the securities laws. They contend that any repayment under term (c) of the promissory notes depended on the success of the business enterprise and that the collateral promised in exchange for Knarr's investments was shown at the preliminary hearing to be insufficient since Black did not have the personal funds to repay Knarr.

---

[8] The presence of two other investors in the Idaho land deal—one of whom appeared to be Black's partner in his effort to hold the property for purchase, does not alter this assessment since neither individual appears to have been recruited in a similar manner or subject to similar terms as those contained in the promissory notes to Knarr.

In *Figueroa,* our high court explained, "The return on any investment which has not been secured with adequate collateral depends on the success of the business. This is true whether the investment contemplates a percentage of the profits or a fixed return." (*Figueroa*, *supra*, 41 Cal.3d at p. 738; see also *Schock*, *supra*, 152 Cal.App.3d at p. 386 ["a finding of inadequacy of collateral, in addition to the investors' dependency on the promoter's success for a return on the investment, will subject the superficial loan transaction to security regulation"].)

This reasoning is consistent with the United States Supreme Court's discussion of fixed returns in *S.E.C. v. Edwards* (2004) 540 U.S. 389, which involved a payphone sale-and-leaseback program in which individuals purchased payphones and received monthly payments under the leaseback and management agreement, amounting to a 14 percent annual return, with the option to later sell back the phone for the full purchase price. (*Id*. at pp. 391-392.) In analyzing the scheme as an "investment contract," the court declared: "There is no reason to distinguish between promises of fixed returns and promises of variable returns for purposes of the [*Howey*] test . . . . In both cases, the investing public is attracted by representations of investment income . . . . Moreover, investments pitched as low risk (such as those offering a 'guaranteed' fixed return) are particularly attractive to individuals more vulnerable to investment fraud, including older and less sophisticated investors." (*Id*. at p. 394.) The court rejected the notion that "unscrupulous marketers of investments could evade the securities laws by picking a rate of return to promise." (*Id*. at pp. 394-395.)

Here, however, we find repayment term (c) to be indicative of the unique framework in which the promissory notes issued, considering this was a one-on-one agreement, Black bound his personal property, and according to Detective Cleveland's preliminary hearing testimony, Black was unequivocal that he owed Knarr the money. Thus, the " ' "character the instrument is given in commerce by the terms of the offer . . . and the economic inducements held out to the prospect" ' " (*Marine Bank*, *supra*, 455

21

U.S. at p. 556) are markedly different from those cases in which the promise to repay, or the fixed rate of return, echo hollow based on the grand scale of the scheme and concomitantly insufficient collateral.

For example, in *People v. Miller* (1987) 192 Cal.App.3d 1505, the defendant generated notes to multiple investors in connection with a luxury home purchase scheme. In finding the notes and trust deeds to be securities, the court observed that "the loans obtained by Miller were so far in excess of the value of the secured interests that no resale or foreclosure could recoup more than a few cents on the dollar to the individual lenders. Moreover, these investors were solicited from the general public and had no control over the success of the venture in which their money was placed." (*Id*. at pp. 1510-1511.) In *S.E.C. v. Wallenbrock* (9th Cir. 2002) 313 F.3d 532, 535, the Ninth Circuit found a pyramid investment scheme in which short-term promissory notes sold to the public and "ostensibly secured by the accounts receivable of Malaysian latex glove manufacturers" involved securities. In assessing the risk-factor associated with the notes, the court observed that if the receivables existed at all, "the investors had no way of reaching the assets. Although each investor ostensibly had a 50% interest in the specific account or accounts in which they invested, the nature of the plan as a pyramid scheme meant that had a large number of investors wanted to cash out their notes at once, some inevitably would have been left out in the cold." (*Id*. at pp. 539-540.)

In sum, the People do not point us to any case examples in which an individualized contract with features similar to those discussed above has been construed as a security within the meaning of the Corporate Securities Law. Indeed, the breadth of transactions and agreements deemed securities under the *Howey* test generally involve instruments intended for wide distribution. (See, e.g., *People v. Sweeney*, *supra*, 228 Cal.App.4th at p. 153 [memberships in "endless chain scheme" online shopping business sold through sales presentations]; *Schock*, *supra*, 152 Cal.App.3d at p. 388 [fractional interests in promissory note sold to numerous "ordinary individual investors" solicited by

22

newspaper advertisements]; *Howey*, *supra*, 328 U.S. at p. 295 [42 persons bought units of citrus grove development offered to the public]; cf. *Figueroa*, *supra*, 41 Cal.3d at p. 734 [it "was not a foregone conclusion" that promissory note to investor responding to newspaper advertisement for business partners was a " 'security,' " and trial court erred in instructing jury that it was a security]; *Moreland v. Department of Corporations* (1987) 194 Cal.App.3d 506, 519 [contracts for purchase and refining of gold ore offered to the public were not " 'investment contracts' " because investors retained control over product and did not share profits of enterprise].)[9]

Only *People v. Park* (1978) 87 Cal.App.3d 550 (*Park*), in which the defendant was charged with one count of selling an unregistered security (Corp. Code, § 25110) but the trial court dismissed the charge pursuant to Penal Code section 995, presents a comparable investment arrangement to that before us. In that case, two individuals invested $40,000 in a proposed land development and condominium project, in exchange for a promise to receive the first $55,000 profit to be realized from the sale of the completed project. (*Park*, *supra*, at pp. 557-558.) The agreement, signed by the defendant and another individual acting on behalf of the investors, made no provision for control, discretion, or participation in the project by the two investors—even failing to name them. (*Id.* at p. 558.) The appellate court found that the evidence supported a reasonable suspicion that the agreement qualified as an investment contract, given "that the profit to be realized from the investment was expected solely from respondent's efforts; that the investors had no control over the management of the enterprise and had no power whatsoever to affect the fortune of the project; and that the success of the enterprise depended solely on the honesty and managerial skill of respondent." (*Id.* at

---

[9] The Ninth Circuit in *S.E.C. v. R.G. Reynolds Enterprises, Inc.*, *supra*, 952 F.2d at page 1130, criticized the *Moreland* court's analysis of the "common enterprise" and "profit" prongs of the *Howey* test as having misconstrued prior Ninth Circuit case law.

p. 563.)  Yet *Park* is distinguishable in that there was no evidence of an individually negotiated agreement providing a repayment option that was not contingent on the success of the enterprise.

We conclude that however problematic Black's conduct in arranging and maintaining Knarr's investment, the promissory notes do not constitute securities within the meaning of the Corporate Securities Law.  This is not, as the People suggest, a finding that all one-on-one contracts are excluded as a matter of law from the definition of a security.  Rather, the individualized nature of the transaction is one factor that must be considered in determining whether that transaction comes within the regulatory purpose and purview of the securities laws.  (See *People v. Davenport*, *supra*, 13 Cal.2d at p. 686 ["it plainly was not the legislative intent that '*every*' note or evidence of indebtedness, regardless of its nature and of the circumstances surrounding its execution, should be considered as included within the meaning and purpose of the act"]; *Marine Bank*, *supra*, 455 U.S. at p. 559 ["Congress intended the securities laws to cover those instruments ordinarily and commonly considered to be securities in the commercial world . . . ."].)  It is consonant with the principle that courts interpreting Corporations Code section 25019 "must look to the substance of the transaction to determine whether protection of the securities laws is necessary." (*Figueroa*, *supra*, 41 Cal.3d at p. 739.)

**DISPOSITION**

The order to set aside counts 4 and 5 of the second amended information is affirmed.

24

_____
                      Premo, J.


WE CONCUR:



_____
      Rushing, P.J.




_____
      Elia, J.




People v. Black
H043360

| | |
|---|---|
| Trial Court: | Santa Cruz County Superior Court<br>Superior Court No. F23816 |
| Trial Judge: | Hon. Stephen S. Siegel |
| Counsel for Plaintiff/Appellant:<br>The People | Kamala D. Harris<br>Attorney General<br><br>Gerald A. Engler<br>Chief Assistant Attorney General<br><br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br><br>Laurence K. Sullivan<br>Supervising Deputy Attorney General<br><br>Bridget Billeter<br>Deputy Attorney General |
| Counsel for Defendant/Respondent:<br>Charles Baxter Black | Mark A. Garver |

People v. Black
H043360