Filed 3/27/24  P. v. Anderson CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAYMOND CHARLES ANDERSON,<br><br>    Defendant and Appellant. | D081078<br><br><br>(Super. Ct. No. SCD276015) |

APPEAL from a judgment of the Superior Court of San Diego County, Evan P. Kirvin, Judge.  Affirmed.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Arlene A. Sevidal and James Michael Toohey, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Raymond Charles Anderson of five counts of grand theft (Pen. Code, § 487, subd. (a); counts 4 (as to victim M.D.), 22 (as to victim K.L.), 36, 40, 42 (as to victim S.S.)) and three counts of securities fraud (Corp. Code, § 25401; counts 37, 39, 43 (all as to victim S.S.)).  It found Anderson not

guilty on counts 1, 2, 3, 5, 12, 17, 19, 23, 24, 26, 31, 41, 45, 49, 51; and hung on the remaining counts,[1] as well as on a white-collar enhancement allegation. The court dismissed a section 1203, subdivision (e)(4) allegation at the prosecution's request.

It sentenced Anderson to a total term of nine years, consisting of a five-year upper term on count 43; consecutive eight-month terms (one-third the midterm) on each of counts 4, 22, and 40; a consecutive one year (one-third the midterm) on each of counts 37 and 39; and stayed eight-month terms (one-third the midterm) on each of counts 36 and 42. The court ordered Anderson to serve eight years in local custody (§ 1170, subd. (h)) and one year under community supervision. It ordered him to pay various fines, assessments, and restitution.[2]

Anderson contends that the federal due process clause, section 487 as amended by Assembly Bill No. 2356, and the principles set out in *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*) require this court to consolidate his grand theft convictions (counts 4, 22, 36, 40 and 42) into a single theft conviction. He further contends the trial court prejudicially misinstructed the jury on the definition of fraud in CALCRIM No. 1806, requiring reversal of his grand theft convictions. Anderson finally contends the evidence was

---

[1]    The court accordingly declared a mistrial on counts 13-16, 18, 20, 21, 25, 27-30, 32-35, 38, 44, 46-48, 50, 52, and 53.

[2]    Specifically, these were a $300 restitution fine and a $300 suspended parole revocation fine (§§ 1202.4, subd. (b) & 1202.45); a $320 court operations assessment (§ 1465.8); a $240 criminal conviction assessment (Gov. Code, § 70373); a $41 theft fine (§ 1202.5); and victim restitution of $50,000 to M.D., $25,000 to K.L., and $53,500 to S.S. (§ 1202.4, subd. (f)). It granted Anderson 452 days total credits and ordered various conditions of community supervision.

insufficient as a matter of law to prove the promissory notes underlying his securities fraud convictions were securities within the meaning of Corporations Code section 25109 and 25401. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Anderson does not challenge the evidence supporting the elements of his individual grand theft convictions or contend his conduct does not constitute grand theft; his sole contention regarding the grand theft convictions is that under the law—specifically section 487, *Bailey, supra,* 55 Cal.2d 514, and principles of due process—they must be consolidated into a single conviction because he acted pursuant to one intention, general impulse or plan. Indeed, Anderson asserts the underlying facts are undisputed for purposes of applying *Bailey*. The question entails analysis as to Anderson's intentions and *how* the thefts were committed. Hence, our recitation of the relevant facts focuses on that inquiry.

*Anderson's Background and Criminal History*

Anderson began inventing at a young age, with a specific interest in electronics, and started a series of businesses. Through some of his ideas, in particular a traffic alert system to notify drivers of an approaching emergency vehicle and a lighted bicycle helmet, he later became acquainted or friends with some prominent politicians and famous people, including boxer Ken Norton, NBA basketball player/coach Stacy Augmon and musician Marion Meadows. He claimed that through Norton he met Jay Leno, but conceded Leno "at a distance . . . just said 'Hi.' " Anderson solicited investors for his companies, which he called Helmet Alert, Traffic Alert and Select One Technologies. He involved his then girlfriend, Kathie Taylor, in the

3

business.[3] Taylor did not invest but had some journalism experience and would take notes or write proposals or solicitations for the company. Anderson convinced others to invest, telling them they could get rich and giving them the impression he was a successful businessman. However, in 2008 or 2009, Anderson was arrested and prosecuted for his conduct related to these companies, and ultimately pleaded guilty to fraud in connection with misusing investor funds. Taylor cooperated in the prosecution.

In 2014, Anderson founded another business, Strategic Technologies Group (STG), focused on creating a lighted motorcycle helmet. Taylor agreed to be involved and serve as STG's president given Anderson's past criminal history. In building a prototype, Anderson got to know K.L., who managed a local electronics store. K.L. later became part of STG's engineering team. Anderson was the head sales person; he ran day-to-day operations, did all the marketing and regularly spoke about the project with people in an effort to seek investors. However, he did not tell investors about his criminal history regarding his past business ventures; that he was a convicted felon who in 2009 had pleaded guilty to six felony counts of grand theft for investors losing over $500,000 in investments and as a result had gone to state prison. His name did not appear on STG's website.

In 2017, a District Attorney investigator became involved after one of STG's investors, believing he had been a victim of fraud, filed a complaint about Anderson. Bank records led the investigator to eventually interview M.D., S.S. and another individual who had invested money with STG. Anderson and Taylor were arrested in March 2018.

---

3    Anderson and Taylor married in 2017, but separated after their arrest. She pleaded guilty to one felony of being an accessory to a crime.

*Grand Theft as to M.D.* (*Count 4*)

M.D., a long-time businessman, learned of Anderson through M.D.'s friend who had accompanied Anderson to a helmet manufacturer as well as a patent attorney's office, and who had invested in STG. M.D. liked the lighted helmet idea, met with Anderson and K.L. who demonstrated the product, and also eventually invested money with Anderson. M.D. viewed it as an investment in the product, not Anderson, though they both had to perform. Anderson asked M.D. to invest $100,000, which M.D. understood would go toward refining the product and paying off vendors, not for Anderson's personal expenses.

In exchange for two $50,000 investments wired in June 2015, M.D. received promissory notes stating he would get 25 percent interest to be paid April 1, 2016, as well as a $2-per-unit royalty from April 1, 2016, through December 31, 2016. The notes guaranteed M.D. no less than $30,000 in royalty income per year. M.D. made subsequent investments in 2015 and 2016. M.D. never got paid on any of the notes. As of February 2018, M.D. determined Anderson owed him over $299,000 on the notes.

Anderson did not tell M.D. about his prior start-up business that never made a profit, or that he had pleaded guilty to six felonies. But he mentioned celebrities who were assertedly involved in the product, such as Norton, Leno and Augmon. About three or four months after the first investment, M.D. learned of Anderson's criminal history, but Anderson told M.D. he had been wrongly accused and was in the midst of suing the person who sent him to prison. M.D. would not have invested with Anderson if he knew he had committed six felony frauds, or that the money was going to meals, coffee, trips and cars.

*Grand Theft as to K.L.* (*Count 22*)

K.L. met Anderson in 2014 when Anderson came into an electronics store that K.L. managed. K.L. eventually helped him install lights into different helmets. K.L. thought Anderson had good ideas, and in 2015, K.L. agreed to act as an engineer for STG and helped draft STG's bylaws. His title was chief technical officer. K.L. had the impression that Anderson was an excellent sales person based on Anderson introducing him to famous or noteworthy people. Anderson also told K.L. he had once met Jay Leno. K.L. traveled to different states to show off the technical aspects of the helmet to different investors, including M.D.

K.L. observed that Anderson was not identified on STG's web site as part of its management team. Anderson told him he did not want to be in the spotlight, and K.L. never asked any follow up questions.

K.L. and his mother invested $25,000 in STG in 2015, after K.L. had been working on a helmet prototype. They received a promissory note in September 2015 for that sum to be paid back 24 months from its execution. Anderson asked K.L. to invest so as to pay for K.L.'s computer, as well as travel expenses for trips to see other investors, potential buyers, and the company that actually produced the helmet. Anderson also asked K.L. if he knew of any other investors. K.L. expected return of his principal investment and to share 10 to 15 percent in the $300 million profit from sales, which they calculated based on nationwide saturation of the patented helmets. He expected his investment would be used for STG purposes; to build the company and the individuals running it in STG's interests. The money K.L. and his mother invested was never paid back. When K.L. asked about repayments to investors, Anderson told him they would be paid as soon as

STG started making money. But STG never made a profit. K.L. learned of Anderson's and Taylor's arrest shortly after it happened.

Anderson never told K.L. about his prior company dedicated to a lighted helmet, that the company never made a profit, or that he had earlier used investor funds to pay earlier investors. He did not disclose his prior grand theft convictions, his conviction for identity theft, his admission to fraud-related conduct leading to investors losing over $500,000, or that he still owed money to those investors.

*Grand Theft and Securities Fraud as to S.S.* (*Counts 36, 37, 39, 40-43*)

S.S. is married to Anderson's brother. In 2016, Anderson and Taylor dropped by S.S.'s Christmas Eve party. Anderson came to visit the next day with a binder or booklet about the company as well as a helmet prototype to talk to S.S. and his brother about his business ventures. He told them the helmet had been approved by the Department of Transportation, and that he had big-name investors helping to promote the product, including Leno, Augmon, Meadows, Shaquille O'Neal, Diane Watson, Maxine Waters, and then Secretary of Transportation Elaine Chao. S.S. understood the big name people would help spread the word, and that the politicians would help pass legislation regarding the product because it was a safety helmet. Anderson initially told them investments were closed, but because they were family he would allow them to invest and make more money than the average person. He felt the company would be worth billions of dollars. S.S. was excited about the product and seriously thought about investing.

Anderson followed up with an e-mail to S.S. setting out his background, but not anything about his felony convictions and incarceration. Another e-mail stated the helmet was patented in the United States and other countries, that it had been tested by the Federal Communications

7

Commission, and that it had been "received" by the law enforcement community. S.S. learned that one of the biggest motorcycle helmet distributors for law enforcement was involved. Anderson told S.S. that her investments would be spent on the helmets, crowdfunding, and paying engineers and other ongoing bills dedicated to the helmets. S.S. expected she would make a profit through her investments and the work of others involved with selling the product.

In December 2016, S.S. gave Anderson a $10,000 cashier's check made out to STG, and signed a promissory note with an 18 percent return and .5 percent of the initial production run. That note was to be paid within six months. She invested additional funds in February and March 2017, via promissory notes with the same terms.[4] In casual conversation at about that time, S.S. asked about Anderson's prior criminal matter, and he told her he was involved with men who stole his idea and was wrongly convicted, but the conviction was overturned and afterwards he sued the State of California, using over a million dollars in damages to restart his company.

Through the period of time that S.S. was investing in STG, Anderson communicated daily with her, supplying her information about the company's success, sending copies of emails showing STG was in touch with the Secretary of Transportation, sending marketing plans showing the product was patented in 2015, and showing S.S. that important people were backing the product. The information made S.S. feel that there was a lot of progress being made and the company was on the right track. In April 2017, S.S. wire

---

[4]    In cross-examination, S.S. testified that her entire investment was $70,000, even though the promissory notes totaled more than that. The apparent discrepancy is of no moment to the question of whether the promissory notes are securities, and as indicated, Anderson does not challenge the evidence of his individual grand theft convictions.

transferred $6,500 to STG. That month, she helped her mother invest $30,000 in STG on the same terms after Anderson told her he had decided to open up investment in the company to her as well, "to gain extra cash for the benefit of the grandchildren going to college and assistance and things like that." S.S. wire transferred a final $10,000 to STG in July 2017. That same day, she received a phone call from an investigating detective and learned that Anderson's claim of being wrongfully convicted was not true.

S.S. never received her principal, interest or anything else from her initial investment or any of her other investments. S.S. would not have invested had she known about the failed helmet lighting business, that none of the investors in that business got their money back, or that her money was paying for expenses such as trips, jewelry, and cars.

DISCUSSION

I. <em>Consolidation of Grand Theft Convictions</em>

A. *Legal Principles*

Grand theft is defined in section 487, providing with exceptions not applicable here that it is committed "[w]hen the money, labor, real property, or personal property taken is of a value exceeding nine hundred fifty dollars ($950)." (§ 487, subd. (a).) Effective January 1, 2023, the Legislature amended section 487 to add subdivision (e), which provides: "If the value of the money, labor, real property, or personal property taken exceeds nine hundred fifty dollars ($950) over the course of distinct but related acts, the value of the money, labor, real property, or personal property taken may properly be aggregated to charge a count of grand theft, if the acts are motivated by one intention, one general impulse, and one plan." (Stats. 2022, ch. 22, § 1.) The Legislature expressly stated that the amendment was

9

"declaratory of existing law in [*Bailey, supra,*] 55 Cal.2d 514." (Stats. 2022, ch. 22, § 2.)

At the time relevant to *Bailey*, felony grand theft required theft of property worth more than $200. (*Bailey, supra*, 55 Cal.2d at p. 518; *People v. Tabb* (2009) 170 Cal.App.4th 1142, 1148.) The question before the California Supreme Court in *Bailey* was "whether [the defendant] was guilty of grand theft or of a series of petty thefts since it appears that she obtained a number of [welfare] payments, each less than $200 but aggregating more than that sum." (*Bailey*, at p. 518.) The court stated: "The test applied in these cases in determining if there were separate offenses or one offense is whether the evidence discloses one general intent or separate and distinct intents. . . . [W]here a number of takings, each less than $200 but aggregating more than that sum, are all motivated by one intention, one general impulse, and one plan, the offense is grand theft. [Citations.] [¶] Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Bailey,* at p. 519.)

In July 2014, a majority of the California Supreme Court decided *People v. Whitmer* (2014) 59 Cal.4th 733 (*Whitmer*), which interpreted *Bailey* and disapproved some of the appellate authorities that had expanded on its rule (*Whitmer*, at p. 741), concluding they had "interpreted *Bailey* more broadly than is warranted." (*Id*. at p. 735.) *Whitmer* involved a manager of a motorcycle dealership who was convicted of 20 counts of grand theft, after he had arranged for the sale of 20 different vehicles to fictitious buyers through the use of falsified financing agreements, resulting in monetary losses to the

10

dealership. (*Ibid.*) The 20 transactions occurred on 13 different dates, to distinct fictitious buyers. (*Ibid.*) The Court of Appeal rejected the defendant's argument based on *Bailey* that he could be convicted of only one count of grand theft and affirmed his convictions. (*Whitmer,* at p. 736.)

On the defendant's petition for review raising whether he was properly convicted of multiple grand theft counts, the *Whitmer* court found the question turned on the proper interpretation of *Bailey*. It explained that in *Bailey*, the defendant made a single fraudulent misrepresentation resulting in a series of payments; there were not separate and distinct fraudulent acts. (*Whitmer*, *supra*, 59 Cal.4th at p. 740.) But in *Whitmer* involving the dealership manager, and other cases *Bailey* had relied upon but distinguished, the defendant had committed similar, but separate and distinct, fraudulent acts. (*Whitmer,* at p. 740.) "Defendant committed a series of separate and distinct, although similar, fraudulent acts in preparing separate paperwork and documentation for each fraudulent transaction. Each fraudulent act was accompanied by a new and separate intent to commit that fraud." (*Ibid.*) According to the *Whitmer* majority, this made "all the difference." (*Ibid.*) It held "a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme." (*Id.* at p. 741.) It adopted the Court of Appeal's reasoning that "a serial thief should not receive a 'felony discount' if the thefts are separate and distinct even if they are similar." (*Id.* at pp. 740-741.)

*Whitmer* relied upon cases that *Bailey* had distinguished but did not overrule, including *People v. Rabe* (1927) 202 Cal. 409, and *People v. Ashley* (1954) 42 Cal.2d 246. As *Whitmer* summarized: "In *Rabe*, the defendant fraudulently obtained money and property by falsely representing that he

11

intended to use the funds and property to establish a corporation. [Citation.] From one individual he secured investments on three separate dates: a payment for $1,250, a payment for $4,000, and a contribution of real property worth $11,000. [Citation.] . . . [T]he Supreme Court rejected his contention that he had committed only a single offense, reasoning that '[i]n each count of the indictment the property . . . was obtained at a different time and was different in character and value . . . .' " (*Whitmer, supra*, 59 Cal.4th at p. 738, citing *Rabe,* at p. 417.)

" 'In *Ashley*, the manager of a corporation obtained funds from two individuals by falsely representing that the funds would be used for one of the corporation's business projects. [Citation.] Because the manager received two payments from each individual, each of which exceeded the threshold amount for grand theft, he was charged with four counts of grand theft. [Citation.] Before the Supreme Court, he contended that he could be convicted on only one count of grand theft with respect to each victim. [Citation.] Relying on *Rabe*, [*supra*, 202 Cal. 409], the court rejected this argument.' " (*Whitmer, supra*, 59 Cal.4th at p. 738, citing *People v. Ashley, supra*, 42 Cal.2d at pp. 252-257, 273.) But *Whitmer* could not retroactively apply its rule to the defendant because of "the long, uninterrupted series of Court of Appeal cases . . . that have consistently held that multiple acts of grand theft pursuant to a single scheme cannot support more than one count of grand theft." (*Id.* at p. 742.)

B. *Contentions*

Anderson contends he is entitled to the retroactive benefit of section 487, subdivision (e). According to Anderson, notwithstanding *Whitmer*, *supra*, 59 Cal.4th 733, the law requires that his five grand theft counts as to M.D., K.L, and S.S. be consolidated into a single count of grand theft even

12

though there were multiple victims, because as evidenced by the record, the prosecutor's arguments, and case law, he committed the thefts "pursuant to a single impulse, plan or scheme." Anderson maintains *Whitmer*'s judicial narrowing of *Bailey* does not apply to the present case given the Legislature's recent amendment of section 487, and thus all of his grand theft convictions must be consolidated into a single conviction and the matter remanded for resentencing.

C. *Analysis*

We need not decide whether the amendment to section 487, subdivision (e) should apply retroactively to Anderson, because as we explain, the amendment declarative of *Bailey* has no effect on Anderson's convictions.

As indicated, *Bailey* did not involve multiple grand thefts committed against multiple victims as here; *Bailey* involved a series of *petty* thefts, as each payment was less than $200, but amounted to more than that sum in total. (*Bailey*, *supra*, 55 Cal.2d at p. 518.) *Bailey* pointed to cases holding that "where as part of a single plan a defendant makes false representations and receives various sums from the victim the receipts may be cumulated to constitute but one offense of grand theft." (*Id*. at pp. 518-519.) It continued: "The test applied in these cases in determining if there were separate offenses or one offense is whether the evidence discloses one general intent or separate and distinct intents. The same rule has been followed in larceny and embezzlement cases, and it has been held that where a number of takings, *each less than $200 but aggregating more than that sum*, are all motivated by one intention, one general impulse, and one plan, the offense is grand theft." (*Id*. at p. 519, italics added.)

When the Legislature amended section 487 to add subdivision (e), it was not codifying the law pertaining to the commission of multiple grand

13

thefts but was declarative of *Bailey*'s petty theft aggregation rule. Subdivision (e) involves situations where "the value of the money . . . taken exceeds nine hundred fifty dollars ($950) *over the course of distinct but related acts . . . .*" Further, the statute relates to *charges*, not convictions. It permits, but does not require ("the value . . . *may properly* be aggregated*"*), the prosecution to "aggregate[ ]" the value of the money "to *charge a count of grand theft*, if the acts are motivated by one intention, one general impulse, and one plan." (§ 487, subd. (e).) Indeed, the *Whitmer* majority acknowledged it was not deciding "whether the *Bailey* rule regarding a series of *petty* thefts applies similarly to a series of *grand* thefts" and observed that *Bailey* was "factually distinguishable." (*Whitmer*, *supra*, 59 Cal.4th at p. 740.) Because subdivision (e) of section 487 does not speak to multiple grand theft convictions, it does not warrant consolidation of Anderson's multiple grand theft convictions to a single grand theft conviction.

Rather, because all of Anderson's grand theft offenses occurred after the July 2014 *Whitmer* decision, *Whitmer*'s holding applies to permit Anderson's multiple convictions for his grand thefts that occurred at different times, involved differing sums of money and different individuals. As in *Rabe,* " 'the property . . . was obtained at a different time and was different in character and value . . . .' " (*Whitmer*, *supra*, 59 Cal.4th at p. 738, quoting *People v. Rabe*, *supra*, 202 Cal. at p. 413.) Anderson thus "may be separately punished for obtaining additional property from [a single victim such as S.S.], even though [his] initial misrepresentations 'were still operating upon the mind' of [S.S.]." (*Whitmer*, at p. 738, quoting *Rabe*, at p. 413.) That is true notwithstanding Anderson may have had "a single overarching scheme." (*Whitmer*, at p. 741.)

14

## II. *Claim of Instructional Error*

The court read CALCRIM No. 1806 to the jury in relevant part as follows: "To prove that the defendant is guilty of theft by the theory of theft by embezzlement, the People must prove that; one, an owner entrusted his or her property to the defendant; and, two, the owner did so because he or she trusted the defendant; and, three, the defendant fraudulently converted or used that property for his own benefit; and, four, when the defendant converted or used the property, he intended to deprive the owner of it. [¶] A person acts fraudulently when he takes undue advantage of another person or causes a loss to that person by breaching a duty, trust or confidence."[5]

Conceding his counsel did not object to the instruction, Anderson contends the trial court erred by instructing the jury with it. He maintains CALCRIM No. 1806 contains an "overly expansive definition of 'fraud,'" which allowed the jury to convict him based on mere negligence, mismanagement, or failing to live up to the victims' trust or confidence, when the law requires that he fraudulently intend to deprive the victims of their

---

[5] The instruction continues: "A good faith belief in acting with authorization to use the property is a defense. In deciding whether the defendant believed that he had a right to the property and whether he held that belief in good faith, consider all the facts known to him at the time he obtained the property along with all the other evidence in the case. [¶] The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable. But if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not held in good faith. [¶] An intent to deprive the owner of property even temporarily is enough. Intent to restore the property to its owner is not a defense."

15

property.[6] He further argues in connection with this problem the language of the fourth element regarding intent to deprive created an ambiguity in that "the jury most likely understood the phrase, 'intended to deprive' as conduct described as fraudulent in the third element of the instruction." Anderson continues that the instruction "was confusing even if the jury did not read the jury instruction in that manner" because "[t]he definition of fraudulent in the third element required something less than specific intent for the defendant to appropriate the victim's property to his own benefit and the phrase, 'intended to deprive,' did not explain the requirement of specific intent." According to Anderson, "[u]nder these instructions, the jury could not have known whether conduct that was merely negligent, or a breach of duty, which had the effect of depriving the victim of his or her property, established a violation of section 487 under an embezzlement theory or whether something more was required."

Anderson maintains the error was prejudicial under any standard because the jurors rejected much of the prosecution's case; they were not required to agree on the form of theft in reaching their verdicts but "obviously viewed [him] as having responsibility for the money/property M.D., K.L. and S.S entrusted to him"; and the prosecutor argued he fraudulently intended to use the money to live off of it "with intent not to give it back." In making his prejudice arguments Anderson paints the facts underlying his convictions in a light favorable to him, arguing he had a good idea that looked promising to

---

6    Anderson argues: "Fraud is not established merely by taking advantage of someone." He maintains the instruction "allowed the jury to conclude [he] acted fraudulently if he merely failed to adequately safeguard property that had been entrusted to him" or if he "violat[ed] the trust or confidence the owner of the property placed in the holder . . . ." Anderson says "violating a trust or confidence does not establish specific intent to appropriate property for one's own benefit."

16

succeed and took steps to bring it to fruition, but because he "was not adept at keeping records and handling investors' property/money does not mean he had committed grand theft under a theory of embezzlement."

The People argue Anderson forfeited the challenge, and we agree in part. "In general, a defendant may raise for the first time on appeal instructional error affecting his or her substantial rights. [Citations.] But '[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial.'" (*People v. Buenrostro* (2018) 6 Cal.5th 367, 428; see also *People v. Hart* (1999) 20 Cal.4th 546, 622 ["Defendant's failure to request . . . a clarifying instruction at trial . . . waives his claim on appeal"].) Anderson's claim that the instruction was confusing as to fraud or specific intent without further explanation "is forfeited because, at bottom, it is an argument that the instruction was incomplete" and thus Anderson "was obligated to request a clarifying instruction and failed to do so, thereby forfeiting [his] appellate challenge." (*Buenrostro,* at p. 428.)

Though we may consider Anderson's argument that the instruction was incorrect as to fraud (*People v. Buenrostro*, *supra*, 6 Cal.5th at p. 428), we reject the contention. We review Anderson's claim de novo, "'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'" (*People v. Rivera* (2019) 7 Cal.5th 306, 326; see also *People v. Lewis* (2023) 14 Cal.5th 876, 900; *People v. Thomas* (2023) 14 Cal.5th 327, 382; *People v. Tran* (2022) 13 Cal.5th 1169, 1199.) "'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.'" (*People v. Thomas,* at p. 382.)

17

"[E]mbezzlement involves 'an initial, lawful possession of the victim's property, followed by its misappropriation.' " (*People v. Gonzales* (2017) 2 Cal.5th 858, 864.) Section 503 defines embezzlement as "the fraudulent appropriation of property by a person to whom it has been intrusted." (See *ibid*.) Courts have cited CALCRIM No. 1806 as a correct statement of the elements of embezzlement (see, e.g., *People v. Selivanov* (2016) 5 Cal.App.5th 726, 764 [citing CALCRIM No. 1806 for the elements of embezzlement]; *People v. Fenderson* (2010) 188 Cal.App.4th 625, 636-637) and we agree the instruction correctly and completely addresses the elements.

In particular, the instruction tells the jury that the defendant must intend to deprive the owners of their property when he or she fraudulently converted or used it. The fourth element defining what it means to act "fraudulently" refers to the conversion or use of the property by undue advantage or by breaching a duty, trust or confidence, not to the defendant's intent or mental state. Thus, we disagree with Anderson's argument that the portion of the instruction discussing the meaning of fraudulent "defined the mental state required for embezzlement."

Nor do we accept Anderson's comparison to *People v. Whitney* (1953) 121 Cal.App.2d 515. *Whitney* involved numerous errors of the lower court in instructing the jury on embezzlement, including by failing to distinguish between grand theft and petty theft, authorizing the jury to convict the defendant of grand theft "regardless of the amount taken," and instructing the jury regarding trustee duties under the Civil Code. (*Id*. at pp. 519-520.) The instruction told the jury that " 'if you find from the evidence to a moral certainty and beyond a reasonable doubt that the defendant did unlawfully, fraudulently and feloniously convert, embezzle and appropriate the money mentioned in the information, or any part thereof, to his own use and

18

contrary to his trust as such agent, then your verdict must be guilty.' " (*Ibid*.) According to the *Whitney* court, that portion of the instruction "omit[ted] the most important element required by the Penal Code sections, the appropriation of such property with fraudulent intent." (*Whitney,* at p. 520.) In other words, the *Whitney* jury received no instruction on the intent element of the crime of embezzlement. "By the instructions thus given and emphasized the jury would naturally understand that any conversion of the trust property was sufficient to establish the criminal offense of embezzlement." (*Ibid*.) Here, the jury was instructed they had to find intent to deprive. No similar instructions were given in *Whitney,* and therefore *Whitney* has no bearing here.

Because the instruction required the jury to find Anderson intended to deprive the owners of their property, it did not allow them to convict Anderson based on a breach of duty or mere negligence. Further, the trial court more specifically instructed the jury that the crime of grand theft by false pretenses or embezzlement as charged in the relevant counts "and any lesser crimes require a specific intent and/or mental state" and "[f]or you to find the defendant guilty of these crimes, the defendant must not only intentionally commit the prohibited act, but must do so with a specific intent or mental state" as "explained in the instruction for that allegation."

Having rejected Anderson's claim of instructional error, we need not reach prejudice. But in any event, we presume the jury followed the instructions and determined Anderson had the requisite intent to convict him of the theft charges, thus, it was not "reasonably likely it convicted him of grand theft under a theory of embezzlement without concluding he intended to appropriate their property to his own use and benefit" as Anderson claims.

19

III. *Substantial Evidence S.S.'s Promissory Notes Were Securities for Purposes of Securities Fraud Convictions*

Anderson contends that the evidence was insufficient as a matter of law that the promissory notes given to S.S. were securities within the meaning of Corporations Code sections 25019 and 25401. Comparing the evidence in this record to that found insufficient in *People v. Black* (2017) 8 Cal.App.5th 889 (*Black*), Anderson argues S.S.'s investments met all the characteristics there because "(1) the promissory notes were individually negotiated; (2) there was no prospect the notes would be publically [*sic*] traded; (3) there was no widespread marketing of the investment opportunity; and (4) the notes were secured by property."[7] He points out the notes additionally made his business unconditionally legally responsible for payment. Anderson asks us to reverse the securities fraud convictions of counts 37, 39 and 43.

A. *Standard of Review*

We apply settled standards. " ' "In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could

---

[7] Elsewhere, Anderson argues: "Case law establishes the promissory notes were not securities because: (1) the promissory notes resulted from personal negotiations and meetings between [him] and [S.S.]; (2) few people (only [S.S.)]) were involved in the investments; (3) security in the properties was either included in the promissory notes or orally promised to the investor; and (4) the promissory notes were unconditional promises to pay by STG, [his] business."

reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence . . . . [Citation.] '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility." ' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1117-1118; see also *People v. Ware* (2022) 14 Cal.5th 151, 167; *People v. Leavel* (2012) 203 Cal.App.4th 823, 832-833.)

B. *Legal Principles*

Sections 25401 and 25540 of the Corporate Securities Law of 1968 " 'criminalize the sale or purchase of securities by means of oral or written communications which either contain false or misleading statements or omit material facts . . . .' " (*Black, supra*, 8 Cal.App.5th at p. 899.)

Corporations Code section 25019 defines security as including "any note; stock; . . . evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; . . . investment contract; . . . or, in general, any interest or instrument commonly known as a 'security' . . . ." Under that statute, "[a]ll of the foregoing are securities whether or not evidenced by a written document." (Corp. Code, § 25019.) "The list of instruments which come within the statutory definition of a 'security' . . . is an expansive one." (*People v. Figueroa* (1986) 41 Cal.3d 714, 734; *People v. Graham* (1985) 163 Cal.App.3d 1159, 1164.) But "the court will look through form to substance" in deciding the question. (*Figueroa*, at p. 737; *Silver Hills Country Club v. Sobieski* (1961) 55 Cal.2d 811, 814 [analyzing section 25019's predecessor statute, former Corporations Code section 25008].) Thus, even if a transaction involves an instrument that is

21

listed in Corporations Code section 25019, "[t]he crucial question nevertheless remains whether the [transaction] comes within the regulatory purpose of the Corporate Securities Law." (*Silver Hills*, at p. 814; accord, *Figueroa*, at p. 735.)

California courts have used two distinct tests to evaluate an alleged security, the "risk capital" test and the *Howey* test (*S.E.C. v. W.J. Howey Co.* (1946) 328 U.S. 293). (*Black, supra*, 8 Cal.App.5th at p. 900.) The trial court in this case instructed the jury on the *Howey* test.[8] This test "asks 'whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.' A common enterprise 'may be established by showing "that the fortunes of the investors are linked with those of the promoters," ' such as by a profit sharing arrangement. [Citation.]

---

[8] The court instructed: "In order to find the defendant guilty of securities fraud, the People must prove each element of the offense beyond a reasonable doubt. If the People have not met this burden, you must find the defendant not guilty. [¶] A security is also called an investment contract. In order to prove an offering is a security, the People must prove that, one, an investment was made; two, in a common enterprise; three, with the expectation of profit, income or some financial benefit derived from the managerial efforts of practices [*sic*]." Though the court may have made a misstatement about the managerial efforts element, the People in closing argument made clear that the element involved "financial profit . . . derived from the managerial efforts of others."

The risk capital test "describes ' "[1] an attempt by an issuer to raise funds for a business venture or enterprise; [2] an indiscriminate offering to the public at large where the persons solicited are selected at random; [3] a passive position on the part of the investor; and [4] the conduct of the enterprise by the issuer with other people's money." ' This test reflects the court's assessment that the term 'security' is defined broadly in order 'to protect the public against spurious schemes, however ingeniously devised, to attract risk capital.' " (*Black, supra*, 8 Cal.App.5th at p. 900.)

An expectation of profits produced by the efforts of others exists 'when " 'the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.' " ' " (*Black*, at p. 900; see also *People v. Smith* (1989) 215 Cal.App.3d 230, 237 [touchstone of a security is the " 'presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others' "].) The *Howey* test is a " 'flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits.' " (*Reiswig v. Department of Corporations* (2006) 144 Cal.App.4th 327, 335; see also *Smith*, at pp. 237-238.)

"[T]he corporate securities laws do not contain an 'all-inclusive formula by which to test the facts in every case. And the courts have refrained from attempting to formulate such a test. Whether a particular instrument is to be considered a security within the meaning of the statute is a question to be determined in each case. In arriving at a determination the courts have been mindful that the general purpose of the law is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon.' " (*People v. Figueroa, supra*, 41 Cal.3d at p. 736.)

In *Black*, the Sixth District Court of Appeal decided whether a single promissory note offered for an investment in a real estate development scheme was a security. (*Black, supra*, 8 Cal.App.5th at p. 892.) The parties amended the note several times to extend its maturity date. (*Ibid*.) The promissory note was negotiated with the individual investor (Knarr) and stated the limited liability company in which Black was the managing

23

member would pay Knarr either (1) his principal and interest at a certain rate based on profit if the property was sold; (2) a certain portion of the property if it were developed; or, (3) if the property was not sold or developed in a year, at Knarr's election, the principal invested and interest at a rate of 10 percent. (*Black, supra*, 8 Cal.App.5th at pp. 892-893.) Black put up separate property as collateral on the loan. (*Id.* at p. 892.) The trial court determined the note and its amendments were not securities under either the risk capital or *Howey* tests, and granted Black's motion to dismiss. (*Id.* at p. 897.)

The Court of Appeal affirmed: "Whether the promissory notes may be deemed securities presents a mixed question of law and fact: ' "The definition of a security is a matter of law. It is the judge's duty to instruct the jury concerning that definition: the way in which a security is identified. Whether a particular piece of paper meets that definition, however, is for the jury to decide." ' " (*Black, supra*, 8 Cal.App.5th at p. 899.) The court found significant the "unique nature of the agreement" (*id.* at p. 902) between the two, particularly the fact it was contingent on the guaranteed return regardless of the property's sale or development. Examining federal and state authorities to assess those factors, the court found Knarr's investment "represented an individually negotiated, one-on-one transaction," which was unlike investment products found to be securities in another case. (*Id.* at p. 906.) Further, Knarr traveled with Black to see the property, which the investor called " 'an obsession for both of us.' " (*Ibid.*) There was also no indication that the note could have been traded publicly, or offered more widely. (*Ibid.*) The presence of two other investors in the land deal did not alter the court's assessment, the court noted, "since neither individual appears to have been recruited in a similar manner or subject to similar

24

terms as those contained in the promissory notes to Knarr." (*Id.* at p. 906, fn. 8.)  The guaranteed return, combined with Black binding his own property to enforce payment, "inserted an element of redress that would be unlikely to 'fall within "the ordinary concept of a security." ' " (*Id.* at p. 906.)  And Black "was unequivocal that he owed Knarr the money." (*Id.* at p. 907.)  "Thus, the ' " 'character the instrument is given in commerce by the terms of the offer . . . and the economic inducements held out to the prospect' " ' [citation] are markedly different from those cases in which the promise to repay, or the fixed rate of return, echo hollow based on the grand scale of the scheme and concomitantly insufficient collateral." (*Ibid.*)

The *Black* court pointed to *People v. Miller* (1987) 192 Cal.App.3d 1505 as an example of notes to be securities:  In *Miller*, "the defendant generated notes to multiple investors in connection with a luxury home purchase scheme.  In finding the notes and trust deeds to be securities, the court observed that 'the loans obtained by Miller were so far in excess of the value of the secured interests that no resale or foreclosure could recoup more than a few cents on the dollar to the individual lenders.  Moreover, these investors were solicited from the general public and had no control over the success of the venture in which their money was placed.' " (*Black*, 8 Cal.App.5th at p. 907.)  *Black* cited for the opposite proposition *People v. Davenport* (1937) 13 Cal.2d 681, explaining a "contract in which the 'alleged purchaser of the "security" . . . *had a right to be paid whether the business prospered or not* . . .' was not a security." (*Black*, at p. 906.)

*Black* also distinguished *People v. Park* (1978) 87 Cal.App.3d 550, which involved a "comparable investment arrangement . . . ." (*Black, supra,* 8 Cal.App.5th at p. 908.)  The defendant in *Park* obtained $40,000 investments from two individuals in exchange for the first $55,000 of profits

25

to be realized from the sale of a completed land development and condominium project.  (*Park,* at pp. 557-558.)  The *Park* court held that the transaction "f[e]ll[ ] squarely within [the *Howey* court's] definition of investment contract . . . .  [T]he transaction involved an investment of funds in [Park]'s alleged land development and condominium project to be built in the future; . . . the profit to be realized from the investment was expected solely from [Park]'s efforts; . . . the investors had no control over the management of the enterprise and had no power whatsoever to affect the fortune of the project; and . . . the success of the enterprise depended solely on the honesty and managerial skill of [Park]."  (*Id.* at p. 563; see *Black* at p. 908.)  *Black* observed that *Park* was unlike the circumstances before it "in that there was no evidence of an individually negotiated agreement providing a repayment option that was not contingent on the success of the enterprise." (*Black*, at p. 909.)

In concluding the notes at issue were not securities, the court in *Black* emphasized it was not "finding that all one-on-one contracts are excluded as a matter of law from the definition of a security.  Rather, the individualized nature of the transaction is one factor that must be considered in determining whether that transaction comes within the regulatory purpose and purview of the securities law." (*Black, supra*, 8 Cal.App.5th at p. 909.)

C.  *Analysis*

Here, Anderson convinced S.S., a family member, through promotional materials about the company and marketing plans, to invest and provided her promissory notes with an 18 percent return and .5 percent of helmet sales.  He initially painted it as an exclusive investment opportunity, but later convinced her that it would be a good idea for her mother to also invest on the same terms for the benefit of their family.  S.S. testified she expected

26

to make a profit through the work of others involved with selling the product. These circumstances meet *Howey*'s test: an investment in a common enterprise or profit sharing arrangement, in which the success or failure of the helmet product was dependent on others. (*Black, supra*, 8 Cal.App.5th at p. 900; *People v. Smith, supra*, 215 Cal.App.3d at p. 237; *People v. Park, supra*, 87 Cal.App.3d at p. 563.)

Though Anderson characterizes his and S.S.'s transaction as a negotiation, the record does not support the claim. S.S. testified Anderson was "going to allow us to make more money than the average person since we were family" and "[b]*ased on the way he explained it*, it was an 18 percent return [and] we were to receive 5 percent off of the sales of the first round or something similar to that." (Italics added.) The jury reasonably could conclude from this that Anderson set out the promissory note terms. And S.S.'s mother received the same terms on her note, undermining Anderson's effort to claim these were individually negotiated agreements like the note in *Black*.

Anderson also argues there was no evidence he engaged in mass marketing or otherwise attempted to make the investment available to a large number of people, nor was there a prospectus for a public offering. But mass marketing or a public prospectus, while perhaps relevant to the risk capital test (see *People v. Smith, supra*, 215 Cal.App.3d at p. 237) are not elements of the *Howey* test for a security, which is a " 'flexible . . . principle' " in any event. (*Reiswig v. Department of Corporations, supra*, 144 Cal.App.4th at p. 335.) The evidence shows S.S. and the others "had no control over the success of the venture in which their money was placed" (*People v. Miller, supra*, 192 Cal.App.3d at pp. 1510-1511; *People v. Park, supra*, 87 Cal.App.3d at p. 563), akin to instruments found to be securities. This was unlike the

27

note in *Black*, which had a repayment option independent of the success of the real estate venture.  (*Black*, *supra*, 8 Cal.App.5th at p. 909.)

We disagree with Anderson's comparison to *Black*.  S.S.'s promissory notes were properly characterized as securities under the *Howey* test, not akin to the individualized note negotiated in *Black*.  Rather, on this record, the jury's finding the promissory notes are securities is not only supported by the evidence, but it is in keeping with the " ' "general purpose of the law . . . to protect the public against the imposition of unsubstantial, unlawful and fraudulent . . . investment schemes and the securities based thereon." ' " (*Black, supra*, 8 Cal.App.5th at p. 900, quoting *People v. Figueroa, supra*, 41 Cal.3d at p. 736; see also *Silver Hills Country Club v. Sobieski, supra,* 55 Cal.2d at p. 814.)

## DISPOSITION

The judgment is affirmed.


O'ROURKE, Acting P. J.

WE CONCUR:


DATO, J.


DO, J.